HARTFORD ACCIDENT AND INDEMNITY
COMPANY ET AL. *v.* ACE AMERICAN
REINSURANCE COMPANY ET AL.
(SC 17625)

Borden, Norcott, Katz, Palmer and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued April 12—officially released December 25, 2007

*Seth P. Waxman,* pro hac vice, with whom were *Jeffrey R. Babbin, Catherine M. A. Carroll,* pro hac vice, and, on the brief, *Jonathan M. Freiman, Kenneth D.*

*Heath, Edward C. DuMont,* pro hac vice, and *Danielle Spinelli,* pro hac vice, for the appellants (plaintiffs).

*Robert A. Knuti,* with whom was *James F. Sullivan,* for the appellees (defendant London Market Insurance Companies et al.).

*William J. O'Sullivan* filed a brief for the Reinsurance Association of America as amicus curiae.

*Opinion*

BORDEN, J. The primary issue in this appeal[1] is the proper construction of the phrase "any one accident" as used in a series of reinsurance contracts between the plaintiffs, Hartford Accident and Indemnity Company and several of its affiliates (Hartford),[2] and the defendants, certain reinsurers.[3] Hartford brought this action for a declaratory judgment, claiming, inter alia, that it was entitled to recover under the reinsurance

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The other plaintiffs include: Hartford Casualty Insurance Company; Hartford Fire Insurance Company; Hartford Insurance Company of Canada; Hartford Insurance Company of Illinois; Hartford Insurance Company of the Midwest; Hartford Insurance Company of the Southeast; Hartford Lloyd's Insurance Company; Hartford Underwriters Insurance Company; Nutmeg Insurance Company; Pacific Insurance Company, Ltd.; Sentinel Insurance Company, Ltd.; Trumbull Insurance Company; and Twin City Fire Insurance Company. For convenience and clarity, we refer to the plaintiffs collectively as Hartford.

[3] Hartford has withdrawn this appeal with respect to the named defendant, Ace American Reinsurance Company, and several other defendants who were named in the original complaint. The defendants that are participating as appellees in this appeal include: Anglo French Insurance Company, Ltd.; Bishopsgate Insurance Company, Ltd.; British and European Reinsurance Company; CNA Reinsurance of London Ltd.; Eagle Star Insurance Company; Gothaer Versicherungsbank Vvag; Helvetia Accident Swiss Insurance Company, Ltd.; Instituto Re De Brazil; Lombard Continental Insurance Company (UK), Ltd.; Minster Insurance Company, Ltd.; Munich Reinsurance Company (UK), Ltd.; Scottish Lion Insurance Company, Ltd.; South British Insurance Company, Ltd.; St. Paul Fire and Marine Insurance Company; and Unionamerica Insurance Company, Ltd.

contracts with the defendants for certain losses on general liability insurance policies issued by Hartford to the MacArthur Company (MacArthur) arising from claims for injuries resulting from MacArthur's production and use of products containing asbestos. The defendants filed a counterclaim for a declaratory judgment claiming, inter alia, that Hartford was not entitled to recovery because Hartford's losses were not the result of "any one accident" under the reinsurance contracts. The defendants filed a motion for summary judgment on the counterclaim and the trial court granted the motion. Hartford then filed this appeal. We reverse the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. For the years 1967 through 1975, Hartford issued general liability insurance policies to MacArthur.[4] MacArthur was a major manufacturer, distributor and installer of asbestos containing products, including insulation, in northern California and the Midwest. During the transportation and installation of these products, asbestos dust was released into the air. Many people who had been exposed to the asbestos dust developed debilitating illnesses, often long after their exposure.

Beginning in the late 1970s, numerous claims were brought against MacArthur for these asbestos related injuries. Hartford defended and paid many of the claims until the early 1990s, when it determined that MacArthur had exhausted its coverage. Thereafter, MacArthur brought an action against Hartford in California, seeking coverage for thousands of additional claims. A key issue in the coverage action was the proper construction of a provision of the insurance policies that defined

---

[4] The first named insured under the policies was MacArthur. Various subsidiaries of MacArthur were also named as additional insureds. For convenience, we refer to all of the insureds collectively as MacArthur.

"occurrence" as " 'an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured' . . . ." The policies further provided that " 'all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.' " MacArthur argued that each claim arose from a separate occurrence, while Hartford contended that all the claims arose from one single occurrence.

Another key issue in the coverage action was whether the claims against MacArthur were subject to the policies' $500,000 yearly aggregate limit for claims within the " 'products hazard' " provision, which applied to " 'bodily injury and property damage arising out of the named insured's products . . . but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.' " Hartford contended that many of the claims involved injuries caused by MacArthur's products after MacArthur had relinquished possession of the products and, therefore, fell within the aggregate limit, which had been exhausted. MacArthur contended that most of the claims fell outside the products hazard provision. In December, 2003, Hartford settled the coverage dispute with MacArthur by agreeing to pay approximately $1.15 billion to a trust responsible for paying the asbestos claimants.

To protect itself against large losses incurred " 'by reason of any one accident,' " Hartford had entered into a series of multilayered, excess of loss reinsurance treaties, referred to collectively as the blanket casualty

treaty (treaty).[5] From 1967 through 1975, the defendants underwrote two upper layers of loss protection under the treaty, and from 1973 through 1975, they underwrote a third layer. The treaty provided that the defendants would be liable for losses, above a specified threshold and below a specified limit, incurred by Hartford under its policies " 'by reason of any one accident.' " The treaty defined " 'any one accident' " as "any one, or more than one, accident, happening or occurrence arising or resulting from one event, casualty or catastrophe upon which liability is predicated, under any one, or more than one, of the policies covered by this Agreement, and, *as respects liability arising out of products manufactured, made, handled, distributed or sold by an assured, liability arising out of property damage or out of malpractice, said term shall also be deemed and construed to mean any one, or more than one, accident, happening or occurrence which the available evidence shows to be the probable common cause or causes of more than one claim under a policy, or policies, or renewals thereof, irrespective of the time of the presentation of such claims to the assured or the Hartford.*" (Emphasis added.) Hereinafter, we refer to the italicized portion of the "any one accident" clause as the common cause provision of the treaty.

In February, 2004, Hartford billed its reinsurers pursuant to the treaty for approximately 10 percent of the $1.15 billion settlement with MacArthur. Hartford billed

[5] A reinsurance treaty reinsures all policies in a defined block of an insurer's business, such as general liability. Under an excess of loss contract, the insurer retains liability for losses up to a specified threshold, known as the retention. If a loss exceeds the retention, the reinsurer is liable for all or an agreed part of the excess, up to the contractual limit of liability. Excess of loss contracts may consist of multiple layers, in which coverage under the first layer is triggered when the amount of the insurer's loss exceeds the retention, and each subsequent layer is triggered when the loss exhausts the limit of the layer below.

about 3.4 percent of the settlement to the defendants.[6] In a letter to the reinsurers, Hartford stated that the claims against MacArthur had arisen "from the insured's alleged handling, distribution and/or sale of asbestos containing products and they therefore [fell] within the ambit" of the common cause language in the treaty's definition of " 'any one accident.' " Hartford also stated in the letter that, "[i]n accordance with this wording, we are accumulating all of the insured's asbestos related [bodily injury] loss and are presenting these exposures on a per insured, per year basis . . . ." The defendants refused to pay the bill on the ground that Hartford's losses under the MacArthur settlement could not be aggregated under the common cause language.

Thereafter, Hartford brought this action seeking, inter alia, a declaratory judgment that it was entitled to recover under the treaty for its losses related to the MacArthur settlement.[7] The defendants brought a counterclaim seeking a declaratory judgment that the MacArthur claims could not be aggregated as " 'any one accident' " under the treaty, and moved for summary judgment. The defendants contended that: (1) the treaty's common cause provision did not apply because the MacArthur losses were not " 'liability arising out of products manufactured, made, handled, distributed or sold by an assured' "; (2) even if the claims did arise out of products, the MacArthur losses could not be aggregated as " 'any one accident' " because they did not have a " 'common cause or causes' "; and (3) even if the claims properly were aggregated, Hartford could

---

[6] Hartford represented in its brief to this court that about 3.4 percent of its settlement with MacArthur was billed to twenty-eight of the defendants named in its original complaint. Hartford has settled its claims against several of those defendants. The amount billed to the defendants who are participating as appellees in this appeal cannot be determined from the record.

[7] The action for declaratory judgment involved additional parties and claims that are not at issue in this appeal.

recover only up to one year's limit of reinsurance coverage.

In its memorandum of decision on the defendants' motion for summary judgment, the trial court assumed, without addressing the substance of the parties' arguments, that there was a genuine issue of material fact as to whether the definition of "any one accident" for "liability arising out of products" applied to the MacArthur claims. The court concluded, however, that, under this court's decision in *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 765 A.2d 891 (2001), the word "occurrence" as used in the underlying MacArthur policies meant each claimant's initial exposure to asbestos or, at most, the exposure of multiple claimants to asbestos at the same place and roughly the same time. The court rejected Hartford's argument that, even if there were multiple occurrences, they had a " 'sufficient commonality' " to come within the common cause language and concluded that, in order to show that the occurrences were the common causes of the MacArthur claims, Hartford would have to show that the exposure of one claimant to asbestos, or the exposure of multiple claimants at a single place and time, caused all of the claims. Because Hartford had not presented and, indeed, presumably could not have presented, any such evidence, the court concluded that the losses could not be aggregated under the treaty's "common cause" language. Accordingly, the court did not reach the defendants' claim that, if the common cause language applied, Hartford could recover only up to one year's limit of reinsurance coverage. The court rendered summary judgment for the defendants. This appeal followed.[8]

---

[8] Although the trial court's granting of the defendants' motion for summary judgment did not dispose of all the claims in the action; see footnote 7 of this opinion; it disposed entirely of the defendants' counterclaim and all claims against some of the appellees and, therefore, was a final appealable judgment as to those parties. See Practice Book § 61-3. Hartford filed a motion for a written determination that the appeal should proceed as to all

Hartford claims on appeal that the trial court improperly determined that the MacArthur claims could be aggregated under the common cause provision only if they shared "one and the same cause."[9] The defendants contend that the trial court properly determined that the "common cause" language in the treaty is not broad enough to encompass Hartford's theory of recovery. They further claim as an alternate ground for affirmance that the common cause language does not apply in the first instance because the MacArthur claims did not arise " 'out of products manufactured, made, handled,

defendants who sought summary judgment pursuant to Practice Book § 61-4 (b) and the trial court granted the motion.

[9] Hartford also claims that the trial court improperly determined that the definition of "occurrence" that we applied to the excess policies in *Metropolitan Life Ins. Co.*, applied to the underlying MacArthur policies. Hartford represents in its brief that, during the settlement negotiations with MacArthur, it took the position that the claims arose from a single occurrence under the policies' continuous exposure clause, which was identical to the one at issue in *Metropolitan Life Ins. Co.*, while MacArthur contended that each claimant's exposure was a separate occurrence. Hartford further states that the amount of the settlement "reflected a compromise between the parties' positions on the issue, and indeed, can be viewed as most congruent with the intermediate position of one occurrence per job site." It contends that under well established "follow the settlement" rules; see *Travelers Casualty & Surety Co.* v. *Gerling Global Reinsurance Corp.*, 419 F.3d 181, 187–90 (2d Cir. 2005) (reinsurer may not relitigate issues that were disputed and settled between insurer and insured); and under the treaty's "follow the forms" clause, which provides that "the reinsurance afforded by this Agreement shall be subject in all respect to all the general and special stipulations, clauses, waivers and modifications of the original policy or policies," the trial court was required as a matter of law to construe the treaty's "any one accident" clause in accordance with the settlement position that each MacArthur job site constituted one occurrence.

We agree with the defendants' contention that, because Hartford presented no evidence in the proceedings on the motion for summary judgment in support of their claim that the MacArthur claims could be aggregated on a per job site basis, this claim should not be a basis for reversing the grant of summary judgment in their favor. Because Hartford's per job site theory depends not only on the meaning of the word "occurrence" as used in the MacArthur policies, but also on the meaning of the word as used in the treaty, which involves questions of fact, however, the viability of the theory may be addressed by the trial court on remand if Hartford presents it.

distributed or sold by an assured.' " Finally, they claim as an alternate ground for partial affirmance that, even if the common cause language applies and the MacArthur claims may be aggregated under the treaty, Hartford is limited to recovering up to one year's limit of reinsurance coverage.[10]

We conclude that the trial court improperly determined that there was no genuine issue of material fact as to whether the MacArthur claims had a common cause or causes within the meaning of the treaty's "any one accident" clause. With respect to the defendants' first claimed alternate ground for affirmance, we conclude that the "arising out of products" language of the common cause provision is ambiguous and, therefore, the claim must be addressed by the finder of fact on remand. With respect to the defendants' claim that Hartford is limited to recovering up to one year's limit of reinsurance coverage, we conclude that we need not resolve this issue on appeal but that it also must be addressed on remand.

Before addressing the substance of the parties' claims, we set forth the standard of review. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his

---

[10] We granted permission to the Reinsurance Association of America to file an amicus brief in this appeal. It subsequently filed a brief in which it contended, in support of the defendants' position, that the trial court properly determined that the "follow the fortunes" doctrine does not require a reinsurer to indemnify a reinsured whenever it has paid a claim. Because our resolution of this appeal is not predicated on the "follow the fortunes" doctrine, we need not address this claim.

burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." (Internal quotation marks omitted.) *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 405, 848 A.2d 1165 (2004). "Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) Id., 406.

A reinsurance treaty, like an insurance policy, "is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes. . . . [U]nambiguous terms are to be given their plain and ordinary meaning. . . . As with contracts generally, a provision in [a reinsurance treaty] is ambiguous when it is reasonably susceptible to more than one reading. . . . The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide. . . .

"If the [treaty] is ambiguous, extrinsic evidence may be introduced to support a particular interpretation. . . . If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact. . . .

"Ordinarily, if an ambiguity arises that cannot be resolved by examining the parties' intentions . . . the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract. . . . Courts in such situations often apply the contra proferentem rule and interpret a policy against the insurer. . . . The contra-insurer rule does not apply, however, in actions by one insurer against another." (Citations omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 305–306. Because reinsurance contracts are, in essence, between

insurers, the contra-insurer rule does not apply to disputes arising from such contracts.

I

We first address Hartford's claim that the trial court improperly determined that the treaty's common cause provision unambiguously foreclosed Hartford's claim under the treaty because, under this court's decision in *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 295, the MacArthur claims were caused by multiple occurrences, namely, the exposure of each claimant to asbestos, and these multiple occurrences could not have constituted a "common cause or causes" under the treaty. We conclude that the treaty's common cause provision is ambiguous and its proper construction involves factual questions concerning the intent of the parties to the treaty.

As we have indicated, the treaty's common cause provision states that " 'any one accident' . . . as respects liability arising out of products manufactured, made, handled, distributed or sold by an assured . . . shall . . . be deemed and construed to mean any one, or more than one, accident, happening or occurrence which the available evidence shows to be the probable common cause or causes of more than one claim under a policy, or policies, or renewals thereof, irrespective of the time of the presentation of such claims to the assured or the Hartford." Hartford claims that this language is unique to the treaty and never has been construed by any court. It contends that, under the provision, the MacArthur claims constituted one "occurrence" because each MacArthur claimant "alleged injury from inhaling asbestos dust that MacArthur generated in the same manner, using the same products and practices, at each of its job sites.[11] These

[11] Hartford claims that "[a]t each of its job sites, MacArthur shaped, fabricated, cut, and installed asbestos-containing insulation and other products, discharging asbestos dust into the air at every step. To facilitate the frequent shifting of its workers from one job site to another, MacArthur used standard-

causes were the same for (that is, 'common' to) each of the thousands of claims."

Hartford further contends that the common cause provision's use of the phrases "any one *or more than one,* accident happening or occurrence" supports the interpretation that the provision permits "the aggregation of multiple claims deriving from multiple causes that are *the same in kind* . . . ." (Emphasis added.) For example, Hartford states, "if two children suffer allergic reactions to their pet cats, it may be said that their conditions share common causes—exposures to cat hair—even though the children were not exposed to the very same cat hairs, or even to the very same cat."

In support of these contentions, Hartford points to several memoranda and items of correspondence between Hartford and its brokers during the 1960s and 1970s relating to the common cause provision. The documents indicate that Hartford had been reluctant to include in the treaty an " 'aggregate extension clause' " that would permit all losses paid by Hartford subject to an aggregate limit under a particular direct policy in a particular year—even if entirely unrelated—to be aggregated for reinsurance purposes. Hartford believed at the time that the unique language of the common cause provision was preferable because, unlike an aggregate extension clause, it would allow aggregation of losses arising from multiple policies spanning two or more policy years. In one of the memoranda relied on by Hartford, a Hartford employee stated that "[t]he 'common cause' wording is so broad as to suggest that nothing should be introduced into the [t]reaty which might lessen its impact." Hartford contends that these

ized operating procedures, so that its fabrication and installation activities— and the resulting discharge of dangerous asbestos dust—occurred in the same way at each site. And at each site, MacArthur was alleged to have performed these activities in the same negligent manner, exposing people at the site to asbestos dust without any appropriate protective measures."

documents establish that the common cause provision is much broader than the standard aggregation provisions that are contained in most reinsurance agreements.

The defendants concede that the trial court improperly determined that, under *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 295, the word "occurrence" as used in the treaty meant each individual MacArthur claimant's exposure to asbestos. See id., 307–308 (as used in excess policies under review in that case, word "occurrence" was unambiguous and meant exposure of individuals to dangerous condition).[12] The defendants claim, however, that, even under

---

[12] In *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 298–99, the plaintiff, Metropolitan Life Insurance Company (Metropolitan), had been named as a defendant in thousands of lawsuits seeking recovery for asbestos related bodily injuries resulting from Metropolitan's alleged failure to publicize the health risks of asbestos exposure. Metropolitan expended hundreds of millions of dollars in defending and settling the claims. Id., 300. The defendant insurers had sold excess general liability insurance policies to Metropolitan that provided coverage for claims after primary, umbrella and first layer excess coverage had been exhausted. Id. The excess policies provided: "The total liability of the company for all damages, including damages for care and loss of services, as the result of any one occurrence shall not exceed the limit of liability stated in the declarations as applicable to each occurrence. For purposes of determining the limit of the company's liability and the retained limit, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." (Internal quotation marks omitted.) Id., 300–301. Metropolitan brought an action seeking coverage under the excess policies for the asbestos related claims. Id., 301. The defendants filed motions for summary judgment claiming, inter alia, that, because Metropolitan's liability arose from each claimant's separate exposure to asbestos, each of the underlying claims should be treated as a separate occurrence under the excess policies. Id., 301–302. The trial court agreed that the "occurrence," as used in the "continuous or repeated exposure" language of the excess policies, was each claimant's exposure to asbestos. Id., 300–301. On appeal, Metropolitan claimed that, contrary to the trial court's conclusion, its liability had been caused by a single occurrence, "i.e., its alleged failure to warn of the health risks of asbestos exposure." Id., 303–304. We concluded that "the occurrence in this case was the exposure of the claimants to asbestos, not Metropolitan's alleged failure to warn. Moreover, the proper interpretation

the more lenient "cause test" that this court also discussed in *Metropolitan Life Ins. Co.*, Hartford still cannot prevail as a matter of law. We disagree. In *Metropolitan Life Ins. Co.*, the plaintiff, Metropolitan Life Insurance Company (Metropolitan), had been named as a defendant in thousands of lawsuits filed

---

of the continuous exposure clause is that it combines exposures to asbestos that occurred at the same place, at approximately the same time, resulting *still*, in multiple occurrences under the policy." (Emphasis in original.) Id., 312.

Relying on this language, the trial court in the present case concluded that, as used in the underlying MacArthur policies, the word " 'occurrence' " meant the exposure of each MacArthur claimant to asbestos or, at most, the exposure of multiple claimants to asbestos at the same place and roughly the same time. The court also concluded that the exposures could not have been the common cause or causes of all of the claims within the meaning of the treaty's "any one accident" clause. In reaching this conclusion, however, the trial court failed to recognize that our conclusion in *Metropolitan Life Ins. Co.* was premised both on the "continuous or repeated exposure to substantially the same general conditions" language of the excess policies; *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 300; which does not exist in the treaty at issue in the present case, and on the *purpose* of the excess policies, which is different than the purpose of the treaty. We emphasized in *Metropolitan Life Ins. Co.*, that the purpose of the excess policies' continuous exposure clause was to allow aggregation of claims that occurred: (1) *at one location*; and (2) as the result of damage that was incurred *over a period of time*, rather than instantly. Id., 311. In contrast, the purpose of the treaty's common cause language indisputably was to allow Hartford to aggregate multiple claims arising from multiple events that took place at *separate locations* and at *different times*—assuming, of course, that the events had a common cause or causes. For example, in their brief to this court, the defendants state that the common cause language would allow accumulation of claims if "an accident creates a tainted batch of products that are then circulated through the stream of commerce and cause multiple insurance claims under Hartford policies." If the word "occurrence" as used in the common cause provision in the present case had the same meaning as the word as used in the excess policies in *Metropolitan Life Ins. Co.*, an "occurrence" would be each individual exposure to the tainted product and such an accumulation would not be allowed. Thus, as the defendants in the present case effectively conceded at oral argument before this court, we conclude that the trial court improperly applied the definition of "occurrence" as used in the excess policies at issue in *Metropolitan Life Ins. Co.* to the common cause provision of the treaty.

throughout the United States seeking recovery for asbestos related injuries resulting from Metropolitan's failure to publicize the health risks of asbestos exposure over the course of decades. Id., 298–99. Metropolitan argued that, under the " 'cause test' " that several jurisdictions have applied in determining the scope of an "occurrence," its failure to warn was a single occurrence. Id., 326. Under the cause test, "an occurrence is determined by the cause or causes of the resulting injury. . . . Using this analysis, the court asks if [t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." (Internal quotation marks omitted.) Id., 326–27 n.26. We noted in *Metropolitan Life Ins. Co.*, that this court previously had rejected the cause test. Id., 326. We also stated, however, that, even if the test were applied, "the defendants would still prevail because [the] failure to warn [about the dangers of asbestos], while possibly a cause of the claimants' injuries, was not one proximate, uninterrupted cause of the injuries, as evidenced by the fact that the injuries occurred at several different places over a period of sixty years." Id., 326–27 n.26. "Under the cause test, each exposure was a separate occurrence that caused the claimants' injuries." Id., 328.

The flaw in the defendants' argument is that none of the cases that we cited in *Metropolitan Life Ins. Co.* in support of our analysis under the cause test involved contractual language that specifically provided for the accumulation of liability arising from a common cause. Accordingly, "the concern that a finding of multiple occurrences would render the defendants' insurance policies meaningless, simply [was] not present . . . . [T]he continuous exposure clause acts to combine claims originating at the same plant at approximately the same time into one occurrence, thus covering most mass tort claims." (Citation omitted.) Id., 329. To conclude in the present case that the " 'last link in the

causal chain' "; id., 322; is the only event that could constitute an "occurrence," i.e., a "common cause," under the common cause provision, would be to render that language meaningless.

The defendants also claim that the common cause provision "incorporates spatial and temporal limitations" that preclude the aggregation of claims that were incurred at hundreds of different locations and over decades. In support of this contention they cite *Travelers Casualty & Surety Co.* v. *Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 760 N.E.2d 319, 734 N.Y.S.2d 531 (2001). In that case, the New York Court of Appeals construed a provision of a reinsurance agreement defining "disaster and/or casualty" as "each and every accident, occurrence and/or causative incident, it being further understood that all loss resulting from a series of accidents, occurrences and/or causative incidents having a common origin and/or being traceable to the same act, omission, error and/or mistake shall be considered as having resulted from a single accident, occurrence and/or causative incident." (Internal quotation marks omitted.) Id., 589. The plaintiff, Travelers Casualty and Surety Company (Travelers), had, in two separate coverage litigations, paid two corporations for claims against the corporations arising from pollution at numerous hazardous waste sites that the corporations had operated for decades. Id., 588–92. Travelers then sought reimbursement from the defendant reinsurers claiming that all of the claims against each separate corporation could be aggregated because the waste sites "shared a 'common origin,' namely, a managerial failure . . . in the implementation and enforcement of [the corporations'] company-wide environmental policy." Id., 592. The trial court held that the sets of claims against each corporation did not constitute single losses. Id., 591, 592. On appeal, the Court of Appeals affirmed the judgments, concluding that,

because the word " 'series' " implied a spatial or temporal relationship between the members of the series, the events at the separate waste sites were not a "series of accidents" and could not be aggregated for purposes of reinsurance. Id., 594.

As Hartford points out, however, the treaty in the present case does not contain the "series" language that was controlling in *Travelers Casualty & Surety Co.* v. *Certain Underwriters at Lloyd's of London,* supra, 96 N.Y.2d 594. Accordingly, we conclude that that case is of little guidance.

We are persuaded that the common cause provision is ambiguous as to whether, as Hartford claims, it allows aggregation of losses that were "meaningfully related" and "arose out of the same pattern of events" or, as the defendants claim, it "incorporates spatial and temporal limitations" that preclude the aggregation of claims that were incurred at hundreds of different locations and over decades. As Hartford points out, the language of the provision appears to be uniquely broad and it never has been construed by any court. We conclude, therefore, that Hartford's interpretation that MacArthur's fabrication and installation activities were a "common cause" of the MacArthur claims is a plausible one.

Moreover, in support of their position to the contrary, the defendants cite the same documentary evidence as Hartford and contend that it "shows that [Hartford's reinsurance broker] repeatedly urged Hartford to purchase an aggregate extension clause for its excess of loss reinsurance contracts, but that Hartford rejected this proposal. . . . In rejecting its broker's recommendation, Hartford demonstrated its intent to have an excess of loss reinsurance without a 'stop loss' or other aggregate feature" under which it could aggregate the MacArthur claims. It is well established that extrinsic evidence may be considered in determining contractual

intent if a contract is ambiguous. See *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 546 n.17, 791 A.2d 489 (2002). The trier of fact will be required to draw the proper inferences, however, from the ambiguous language of the common cause provision and the accompanying documentary evidence.

In sum, because the language of the treaty's common cause provision is ambiguous, its meaning involves a genuine issue of material fact, Hartford is entitled to present evidence in support of its interpretation to a fact finder and the fact finder will be required to determine, as a factual matter, the meaning of the common cause provision. Accordingly, we conclude that the trial court improperly rendered summary judgment in favor of the defendants.

## II

We next consider the defendants' claimed alternate ground for affirmance that the treaty's common cause provision does not apply to the MacArthur claims in the first instance because the claims did not arise "out of products manufactured, made, handled, distributed or sold by an assured . . . ." We conclude that the "arising out of products" language of the common cause provision is ambiguous as to whether it applies to the MacArthur claims.

The following undisputed facts are relevant to our resolution of this claim. The general liability policies issued by Hartford to MacArthur defined " 'products hazard' " to include "bodily injury . . . arising out of the named insured's products . . . but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others . . . ." " '[N]amed insured's products' " was defined in relevant part as "goods or

products manufactured, sold, handled or distributed by the named insured . . . ." The policies defined " 'completed operations hazard' " to include "bodily injury . . . arising out of operations . . . but only if the bodily injury . . . occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured." " 'Operations' " included "materials, parts or equipment furnished in connection therewith." The MacArthur policies imposed a $500,000 yearly aggregate limit of liability for bodily injury claims falling under the " 'products hazard' " definition. There was no such limit for other claims against the company.

In its complaint seeking coverage from Hartford, MacArthur alleged that it had "sold, installed, and/or used certain materials and products that contained asbestos" and that the claimants had sought "damages for bodily injury and/or death allegedly caused, in whole or in part, by materials or products containing asbestos . . . ." During the coverage litigation between Hartford and MacArthur, Hartford contended that many of the MacArthur claims were subject to the aggregate limit for claims brought under the policies' " 'products hazard' " provision, which had been exhausted. MacArthur contended, to the contrary, that most of the claims were not subject to the aggregate limit because the claimants' injuries had been caused by exposure to asbestos dust created during the installation of the products while MacArthur still had possession of them. When the parties settled the claims, neither side conceded the correctness of the other's position.

The defendants claim that, because Hartford did not pay the MacArthur claims under the " 'products hazard' " provision of the MacArthur policies, they are not subject to the treaty's common cause provision. They point out that the common cause provision refers to " 'products manufactured, made, handled, distributed

or sold by an assured,' " while the products hazard provision of the MacArthur policies refer to "goods or products manufactured, sold, handled or distributed by the named insured," and contend that "[t]he close linguistic correspondence between the [common cause provision] and the products hazard in Hartford's policies shows, as a matter of logic and common sense, that the language of the provisions is designed to apply to the same thing—the products liability coverage provided to MacArthur pursuant to the products hazard in Hartford's policies."

Hartford contends that, regardless of whether it paid the MacArthur claims under the policies' " 'products hazard' " provision, they arose out of MacArthur's products and, therefore, they are subject to the treaty's common cause provision. Hartford points out that, unlike the underlying policies, the treaty does not limit products claims to injuries occurring away from premises owned by or rented to the insured and after the insured has relinquished possession of the products.

The defendants rely on *Fibreboard Corp.* v. *Hartford Accident & Indemnity Co.*, 16 Cal. App. 4th 492, 20 Cal. Rptr. 2d 376 (1993), in support of their claim. Their reliance is misplaced. That case involved a coverage dispute between a manufacturer of products containing asbestos and its insurer. Id., 497–98. The manufacturer claimed that numerous asbestos related personal injury claims that had been brought against it did not come within the " 'products hazard' " provision of its liability policy, which was substantially identical to the provision in the present case. Id., 498–99. Rather, the claims were based on "theories such as concert of action, failure to disclose hazardous nature of products, civil conspiracy, failure to develop asbestos-free products and market share liability . . . ." Id., 500. The trial court concluded that the claims were covered by the products hazard provision. Id. On appeal, the California

Court of Appeal explained that "a manufacturer or person who performs a service can incur liability in a number of ways, including (1) while work is in progress, [and] (2) after completion . . . . An injury or loss may result while an activity is in progress, and prior to the completion thereof, either as a result of an act of negligence or an omission. Such liability is embraced within the ordinary liability aspect of a public liability policy under coverage for premises-operations. . . . [O]nce a product has been completed and sent to market . . . liability may be incurred by reason of a defect in merchandise or improper workmanship. It should be clear that the premises-operations coverage is not appropriate coverage and the individual now needs products liability or completed operations coverage. The coverages are complementary and not overlapping . . . ." (Internal quotation marks omitted.) Id. In the language relied on by the defendants in the present case, the court stated "[t]*hus, as a matter of sequencing, it is well to recognize that products liability is a coverage that takes over where premises-operations leaves off* . . . ."[13] (Emphasis added; internal quotation marks omitted.) Id., 500–501. The court concluded that "[w]ithin the framework of the Hartford policies and the continuum of coverage provided for liability stemming from operations and products, it is obvious that the traditional products claims in the underlying com-

---

[13] The insured claimed in *Fibreboard Corp.* that the claims against it were not "products hazard" claims because they had not arisen from products, not because the claims had arisen while the products were on the insured's premises or within its possession. *Fibreboard Corp.* v. *Hartford Accident & Indemnity Co.*, supra, 16 Cal. App. 4th 500. Thus, the court was not required to consider the distinction between products hazard claims and operations claims involving products, or whether the latter could be considered claims "arising from products" or products liability claims. Accordingly, we interpret the court's statement that "products *liability* is a coverage that takes over where premises-operations leaves off"; (emphasis added; internal quotation marks omitted) id., 500–501; to refer to products *hazard* coverage. But see footnote 15 of this opinion.

plaints, namely, those asserting negligent testing, design, manufacture and sale; strict liability for design and manufacturing defects; failure to warn; breach of warranties; misrepresentation and the like, are within the four walls of the 'products hazard' clause." Id., 502.

As the defendants concede, however, the question before us in the present case is not whether the MacArthur claims are properly characterized as "products hazard" claims or premises operations claims. The question is whether premises operations claims that admittedly do not come within the " 'products hazard' " provision of the MacArthur policies because they arose before the product had been relinquished by the insured can nevertheless come within the treaty's common cause provision because they "[arose] out of products." The decision of the New York Court of Appeals in *Frontier Insulation Contractors, Inc.* v. *Merchants Mutual Ins. Co.*, 91 N.Y.2d 169, 690 N.E.2d 866, 667 N.Y.S.2d 982 (1997), provides some guidance on that question. That case involved a coverage dispute between an asbestos insulation contractor and its insurers involving multiple asbestos related personal injury claims. Id., 173–74. The insurers contended that all of the claims fell within the policies' exclusions for products hazards. Id., 175. The court concluded that this claim "misses the mark . . . because the focus in determining whether a product-hazard exclusion applies is not simply whether an insured's product caused the loss at issue, but rather is dependent on the location of the accident and the possession of the product . . . . [The insurers'] argument fails to appreciate that *an exclusion for product hazards governs only one subset of product liability claims.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 175–76. The court explained that "[t]he insurance industry has segregated product-liability hazards and the premiums charged therefor by categorizing them as either risks arising

while work is in progress, or as those arising from the defective nature of a completed product that has been placed in the stream of commerce . . . . An insured may cover the first risk by purchasing coverage for 'premises-operations' . . . ." (Citations omitted.) Id., 176. "The distinct risk of loss occasioned by a defect in the insured's product, which manifests itself only after the insured has relinquished control of the product and at a location away from the insured's normal business premises, is covered by the purchase of separate 'products hazard' coverage . . . ." (Citation omitted.) Id. The court then stated that the asbestos could have been a product within the meaning of the policies' definition of " 'named insured's products' "—which was identical to the definition in the present case—if the contractor had traded or dealt in asbestos. Id., 177. Assuming that to be the case, the court concluded that the insurers would be relieved of their duty to defend the claims only if they established that the claims fell squarely within the products hazard provisions, i.e., that the claims arose away from the insured's premises and after possession of the asbestos had been relinquished. Id. Thus, the court in *Frontier Insulation Contractors, Inc.*, recognized that, although product hazard claims and operations claims are mutually exclusive, some operations claims may arise out of products.[14]

The defendants in the present case do not dispute the conclusion of the court in *Frontier Insulation Con-*

[14] See also *Commercial Union Ins. Co.* v. *Porter Hayden Co.*, 116 Md. App. 605, 692–93, 698 A.2d 1167 (liability for injuries resulting from exposure to asbestos products could arise under operations clause if exposure occurred before product was relinquished by insured), cert. denied, 348 Md. 205, 703 A.2d 147 (1997); *Continental Casualty Co.* v. *Employers Ins. Co. of Wausau*, 16 Misc. 3d 223, 230–31, 839 N.Y.S.2d 403 (2007) (products hazard provision covers risks due to defective product that has been put into stream of commerce while premises/operations provision covers "risks that arise due to injuries from the defective product at the insured's premises or while the work with the product is still in progress").

*tractors, Inc.*, that products hazard claims constitute only a subset of claims that can be said to arise from products.[15] Nor do they claim that the asbestos products that caused the injuries at issue in the MacArthur litigation were not "products manufactured, made, handled, distributed or sold" by MacArthur, as stated in the treaty's " 'any one accident' " clause. They claim only that the " 'products hazard' " provision of the underlying policies constituted a limitation on the treaty. Therefore, they argue, the clause applies only to claims arising "after physical possession of such products has been relinquished to others . . . ."

We acknowledge that the close linguistic similarity between the language of the treaty's common cause provision and the products hazard provision of the underlying policies suggests some correspondence in

---

[15] The defendants do argue that "it is problematic whether many of the claims against MacArthur are even products liability claims under tort law. Once there has been a *sale* of a defective product, injuries caused by the defect are called products liability claims under the [Restatement (Third), Torts, Products Liability § 1, p. 5 (1998)]. The determination of whether a product is defective is made 'at the time of sale or distribution.' [Id., § 2, p. 14.] If the MacArthur 'product' was an 'insulation system' that was unfinished at the time MacArthur created asbestos dust, then it was not a product liability claim according to the Restatement [Third] . . . because there had not been a sale or distribution of a defective product." (Emphasis in original.) Even if we were to assume that the defendants are correct, however, the treaty does not unambiguously limit the "liability arising out of products" language to losses that arise from "products liability" as that term is technically defined in various statutes and case law. As the court in *Fibreboard Corp.* stated, "the phrase arising out of does not purport to regulate the theory of liability or the standard of causation . . . . Rather, it identifies a core factual nucleus, i.e., products manufactured, sold or distributed by the insured, and links that nucleus to the bodily injury or property damage covered under the policy. This link is not made in terms of tort causation. Tort causation is assumed within the requirement of the general insuring clause that the insured be found legally liable to pay damages. . . . The arising out of embellishment then broadly links the insureds' products with the resulting bodily injury or property damage." (Citations omitted; internal quotation marks omitted.) *Fibreboard Corp.* v. *Hartford Accident & Indemnity Co.*, supra, 16 Cal. App. 4th 504–505.

meaning between the provisions. We also are compelled to acknowledge, however, that the treaty itself contains no express limitation related to physical possession of the products. Moreover, there does not appear to be anything about the language of the common cause provision that would render its application to claims arising from a product before possession of the product has been relinquished to others unfeasible, illogical or inconsistent with other treaty provisions or principles of reinsurance. Indeed, none of the parties has cited, and our research has not revealed, any cases construing an "arising out of products" provision of a reinsurance agreement.

We conclude, therefore, that the "arising out of products" portion of the common cause provision is ambiguous as to whether it refers to liability arising out of the products hazard provision of the underlying MacArthur policies or, instead, refers to any claim arising from a product, regardless of whether MacArthur had relinquished physical possession of the product at the time that liability was incurred. Accordingly, the meaning of the provision must be determined by the finder of fact on remand.

The defendants also rely on documentary evidence in support of their interpretation of the "arising out of products" language. They point out that, in an internal Hartford memorandum written within three months of the effective date of the first MacArthur policy, a Hartford employee stated, in response to a suggestion from its broker that a change in the treaty might be required because the new policy form had separated "products from completed operations," that "[t]he definition of the term 'any one accident' in the [treaty] refers to liability 'arising out of products manufactured, made, handled, distributed by an insured.' It seems clear that this is intended to refer only to the 'products' area and not to the 'completed operations' area." The defendants

contend that this constituted an express acknowledgment by Hartford that "liabilities arising out of products" were separate from its liabilities arising from operations. As we have indicated, extrinsic evidence may be considered in determining contractual intent only if a contract is ambiguous. See *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, supra, 259 Conn. 546 n.17. We are not persuaded, however, that this documentary evidence is sufficient to remove the ambiguity of the "arising out of products" language.

### III

Finally, we address the defendants' claimed alternate ground for partial affirmance that, even if the common cause provision applies to the MacArthur claims and the claims arose from a common cause or causes, the claims would have to be aggregated in one treaty year and subjected to one retention by Hartford and one reinsurance limit, and could not be aggregated on a "per insured, per year" basis. The defendants raised this claim in the trial court and in their preliminary supplemental statement of issues on appeal on the basis of their understanding that Hartford was claiming that all of the MacArthur losses arose out of one occurrence. In their brief to this court, however, the defendants state that they "no longer advance 'telescoping'[16] as a dispositive issue" because, in its main brief, "Hartford appears to have . . . finally abandoned its single 'any one accident' position" and now claims that the underlying losses occurred during each of the nine years that Hartford insured MacArthur. In its reply brief, Hartford contends both that the defendants have inadequately briefed and have abandoned their claim that the losses must be aggregated in one year, and that Hartford's claim that the losses occurred over nine years is not

[16] "Telescoping" refers to the practice of combining all losses involving a continuing injury into a single policy period.

inconsistent with its claim that the losses arose out of " 'any one accident.' "

We conclude that we need not resolve this issue and that it must be addressed, if necessary, by the trial court on remand. First, the resolution of the telescoping issue depends in part on the resolution of the question of whether the losses may be aggregated under the treaty and, if so, how they should be aggregated. If the trial court resolves the aggregation question in the defendants' favor, then there will be no need to address the telescoping issue. Second, the telescoping issue appears to involve questions of fact that must be addressed by the trial court in the first instance.[17] Finally, the defendants do not appear to be asking this court to resolve the telescoping issue at this time.

The judgment is reversed and the case is remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.

---

[17] For example, the defendants state in their brief that Hartford's billings and its report to the reinsurers "implied a *single* occurrence with one common cause, although the billing arbitrarily and illogically (for per-event excess of loss reinsurance) allocated *all* of the *loss* equally to the nine MacArthur policy periods." (Emphasis in original.) The trial court made no factual findings on this matter.