******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom McDONALD and ESPINOSA, Js., join, concurring and dissenting. I agree with parts I and III of the majority opinion, but respectfully disagree with the majority's conclusion in part II that the policy unambiguously provides for only $1 million in professional liability coverage for all of the defendants'[1] claims because that is the aggregate limit for professional liability coverage at each location. Instead, I would conclude that endorsement no. 3, which provides for an "[a]ggregate [p]olicy [l]imit" of $10 million, when read in conjunction with the declarations page, renders the terms of the policy ambiguous. Accordingly, I would adhere to our well established precedent and construe the terms of the policy in favor of the insured and, thus, in favor of providing coverage. See *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 406, 848 A.2d 1165 (2004) ("[w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted" [internal quotation marks omitted]). I therefore respectfully dissent from part II of the majority opinion.

I agree with the facts and procedural history set forth in the majority opinion. I also agree with the majority that the resolution of this issue requires us to interpret the terms of the insurance policy. "[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance

company drafted the policy." (Internal quotation marks omitted.) *Johnson* v. *Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 643, 31 A.3d 1004 (2011).

In view of the fact that the primary inquiry in this matter is whether the policy is unambiguous, I emphasize that "[t]he fact that the parties advocate different meanings of the [insurance policy] does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 786, 900 A.2d 18 (2006). "Rather, insurance policy language is ambiguous if we determine that it is 'reasonably susceptible to more than one reading.' " Id., quoting *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 305, 765 A.2d 891 (2001). In contrast, "[a] contract is unambiguous when its language is clear and conveys a definite and precise intent." *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2002). In determining whether policy language is ambiguous, we read the policy "from the perspective of a reasonable layperson in the position of the purchaser of the policy." (Internal quotation marks omitted.) *Israel* v. *State Farm Mutual Automobile Ins. Co.*, 259 Conn. 503, 509, 789 A.2d 974 (2002).

The primary issue is whether the phrase "[a]ggregate [p]olicy [l]imit" contained within endorsement no. 3 can be reasonably read to amend the phrase "[a]ggregate [l]imit" of both professional liability and general liability coverage from $1 million, as stated on the declarations page, to $10 million. The plaintiff, Lexington Insurance Company, claims, and the majority agrees, that the aggregate policy limit contained within endorsement no. 3 clearly and unambiguously provides that $10 million is the maximum amount of insurance available under the entire policy when claims for both types of coverage, at all insured locations, are combined. The majority concludes that the trial court improperly equated the terms "[a]ggregate [p]olicy [l]imit" and "[a]ggregate [l]imit" because the terms are different and, therefore, the majority claims it is clear that the plaintiff intended each term to have a different meaning. The majority additionally relies on the fact that the term "[a]ggregate [p]olicy [l]imit" only appears in endorsement no. 3, while the term "[a]ggregate [l]imit" appears in the declarations page and in § IV B of the professional liability part of the policy, both prior to and following its amendment by endorsement no. 3. The majority therefore concludes that, by virtue of the placement of the two terms and the absence of the word policy in the term "[a]ggregate [l]imit," it is clear that the term "[a]ggregate [p]olicy [l]imit" does not amend the term "[a]ggregate [l]imit." Instead, the majority concludes that the term "[a]ggregate [p]olicy [l]imit" unambiguously amends the policy to place a limit on the maximum amount of insurance available under the entire policy when claims for both types of coverage, general

liability and professional liability, at all insured locations, are combined, while the term "[a]ggregate [l]imit" refers to the total amount available for professional liability coverage only, at a particular location. While I agree that the majority's interpretation of the policy is reasonable, I disagree that the policy language is unambiguous and compels only one conclusion.

I begin my analysis with the language of the relevant portions of the insurance policy. On the declarations page of the policy, under the heading "LIMITS OF INSURANCE," the following provisions are included:

"(a) Healthcare Professional Liability

"Aggregate Limit $1,000,000

"Each Medical Incident $ 500,000 . . .

"(b) Healthcare General Liability

"Aggregate Limit $1,000,000 . . .

"Each Occurrence Limit $ 500,000 . . . ."

As the majority points out, it is undisputed that only professional liability coverage is available for the individual defendants' claims.

Section IV of the professional liability part of the policy, entitled "LIMITS OF INSURANCE," provides in relevant part: "The [a]ggregate [l]imit is the most we will pay for the sum of all damages under this [c]overage [p]art." Additionally, § IV of the general liability part of the policy, which is also entitled "LIMITS OF INSURANCE," contains similar language. Specifically, § IV B provides in relevant part: "The [a]ggregate [l]imit is the most we will pay for the sum of [all damages under the general liability coverage part of the policy] . . . ."

The policy also contains a number of endorsements. Endorsement no. 3 is entitled "AGGREGATE LIMITS OF ENDORSEMENT [GENERAL LIABILITY/PROFESSIONAL LIABILITY]." That endorsement provides in relevant part:

"The Policy is amended as follows:

"I. AGGREGATE POLICY LIMIT
"The Aggregate Policy Limit stated below is the most *we* will pay for any annual period for the sum of all damages payable under the [professional liability coverage part] and the [general liability coverage part].

"AGGREGATE POLICY LIMIT: $10,000,000.

"II. AGGREGATE LIMITS PER LOCATION
"Subject to the Aggregate Policy Limit stated in Item I. above:

"A. HEALTHCARE PROFESSIONAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES, Section IV. Limits of Insurance, Item B. is deleted in its entirety and replaced with the following:

"The Aggregate Limit is the most *we* will pay for the sum of all damages under this Coverage Part. The Aggregate Limit shall apply separately to each *location* owned or rented by *you*.

"B. HEALTHCARE GENERAL LIABILITY COVERAGE PART FOR LONG TERM CARE FACILITIES, Section IV. Limits of Insurance, Item B. is deleted in its entirety and replaced with the following:

"The Aggregate Limit is the most *we* will pay for the sum of [all damages under the general liability coverage part of the policy] . . . ." (Emphasis in original.)

The majority states that, because both types of coverage are included in the definition for "[a]ggregate [p]olicy [l]imit," the term clearly conveys that the aggregate policy limit is the most the plaintiff will pay annually for the sum of all damages "under *both* the general liability and professional liability parts of the policy." (Emphasis in original.) I respectfully disagree.

An examination of the relevant terms of the policy reveals the ambiguity in the policy language. First, the terms "[a]ggregate [l]imit" and "[a]ggregate [p]olicy [l]imit" are extremely similar and, therefore, it is not unreasonable to assume that a layperson reading the policy would conclude that the terms are equivalent and that both refer to the maximum amount the insurer will pay out under the professional liability and general liability coverage parts, respectively. The majority dismisses this similarity, and concludes that because the phrase "[a]ggregate [p]olicy [l]imit" contains the word policy, it is a different term than "[a]ggregate [l]imit" and therefore must be construed differently. I agree with the majority that when different terms are employed within the same writing, different meanings are often intended. See *Scholastic Book Clubs, Inc.* v. *Commissioner of Revenue Services*, 304 Conn. 204, 217, 38 A.3d 1183 (applying rule in statutory construction), cert. denied, U.S. , 133 S. Ct. 425, 184 L. Ed. 2d 255 (2012). The similarities between the definitions of the two phrases, however, mitigate any distinction that the word policy places on the terms. Specifically, the aggregate limit for professional liability coverage is defined in § IV B as "*the most* [*the insurer*] *will pay for the sum of all damages* under this [c]overage [p]art," while the aggregate policy limit is defined in endorsement no. 3 as "*the most* [*the insurer*] *will pay* for any annual period *for the sum of all damages* payable under the [professional liability coverage part] and the [general liability coverage part]." (Emphasis added.) Thus, the definitions contain identical "for the sum of all damages" language. In light of the fact that the definitions of the terms contain similar language and, in my view, can reasonably be read to have the same meaning, I would decline to conclude that the qualifying word policy in the phrase "[a]ggregate [p]olicy [l]imit" clearly

distinguishes it from the term "[a]ggregate [l]imit."

Furthermore, in my view, the fact that both the professional liability and general liability coverage are referenced in the definition of aggregate policy limit does not unambiguously indicate that it is distinct from the policy's aggregate limit. Once again, the aggregate policy limit is defined in endorsement no. 3 as "the most [the insurer] will pay for any annual period for the sum of all damages payable under the [professional liability coverage part] *and* the [general liability coverage part]." (Emphasis added.) The use of the word "and" to link the two coverage parts does not clearly indicate that the insurer intended to combine the sum of all damages paid under *both* the general liability and professional liability parts of the policy when determining whether an aggregate limit for the entire policy had been reached. Rather, I would conclude that a reasonable layperson reading the policy could conclude that, the "[a]ggregate [p]olicy [l]imit" in endorsement no. 3 amends the "[a]ggregate [l]imit" for both professional liability and general liability, so that the "[a]ggregate [l]imit" for both coverage parts is $10 million each. In other words, a layperson in the position of the purchaser could read the definition of aggregate policy limit in endorsement no. 3 and conclude that $10 million is the most that the insurer will pay annually to each location under the professional liability coverage part of the policy and $10 million is the most that the insurer will pay annually to each location under the general liability coverage part of the policy.

I find further support for my reading of the policy in the fact that the aggregate policy limit set forth in endorsement no. 3 acts to amend the policy as a whole, and is not preceded by language purporting to insert that term into the "LIMITS OF INSURANCE" section of either the professional liability or general liability coverage part. Part II of endorsement no. 3, entitled "[a]ggregate [l]imits [p]er [l]ocation," on the other hand, explicitly applies to the "LIMITS OF INSURANCE" sections of both coverage parts, and provides, inter alia, that the "[a]ggregate [l]imit" applies separately to each location owned or rented by the insured. If the "[a]ggregate [p]olicy [l]imit" was in fact a new limit to the policy that placed a limit on the maximum amount of insurance available under the entire policy, it is reasonable to assume that it would be included in the "[l]imits of [i]nsurance" section of the policy. As written, however, the "[a]ggregate [p]olicy [l]imit" does not apply to any specific section, but rather applies to the policy as a whole. Accordingly, I would conclude that a layperson reading the policy could reasonably expect that the "[a]ggregate [p]olicy [l]imit" amends the "[a]ggregate [l]imit" for both professional liability and general liability coverage stated on the declarations page of the policy and, therefore, expands coverage at each location to $10 million for each type of coverage.

Additionally, part II of endorsement no. 3 begins by stating that the following changes to the policy are "[s]ubject to the [a]ggregate [p]olicy [l]imit stated in [i]tem I. above . . . ." Part II of endorsement no. 3 then states that the aggregate limit for each coverage part applies separately to each location owned or rented by the insured. Thus, because part II is "[s]ubject to the [a]ggregate [p]olicy [l]imit" of $10 million in part I, it would be reasonable to assume that the aggregate limits referred to in subsections A and B of part II, for professional liability and general liability, respectively, are $10 million each.

The majority claims, however, that interpreting the policy so that the $10 million aggregate policy limit contained within endorsement no. 3 amends the $1 million aggregate limits set forth on the declarations page would render the latter superfluous. I respectfully disagree. Interpreting endorsement no. 3 as amending the $1 million "[a]ggregate [l]imits" for professional liability and general liability coverage stated in the declarations page is, in my view, no different than certain aspects of the majority's interpretation of the policy. For example, the majority states that "[t]he policy, without consideration of the endorsements, provides for a total of $1 million in general liability coverage and a total of $1 million in professional liability coverage for a single location." Presumably, the single location referred to by the majority is the address that appears in item 2 on the declarations page, which is a location in Farmington. This is the only address that can be attributed to the insured without reference to the endorsements. The majority then states that "[t]he policy then is amended by endorsements so as to cover additional locations owned or rented by the insured. Endorsement no. 2 lists seven different locations and provides that the policy shall apply to them." The address that appears on the declarations page, however, is not included in the addresses listed in endorsement no. 2. Thus, it follows that, by taking into account the address listed on the declarations page and the seven addresses listed in endorsement no. 2, the policy covers eight separate locations. The majority states, however, and the parties do not dispute, that the policy only applies to the seven locations listed in endorsement no. 2. The majority's interpretation of the policy, therefore, amends the policy so that the address included in the declarations page is not covered by the policy. Similarly, my interpretation of the policy would amend the policy so that the aggregate limits listed on the declarations page for professional liability and general liability are changed from $1 million to $10 million. Therefore, I interpret endorsement no. 3 as amending the aggregate limits on the declarations page, rather than rendering them superfluous.

On the basis of the foregoing, I would conclude that

the policy language is reasonably susceptible to more than one interpretation and, accordingly, is ambiguous. Having reached this conclusion, I turn to resolving the ambiguity. The plaintiff claims that, if the policy is ambiguous, this court must consider extrinsic evidence to determine the intent of the parties. In support of this position, the plaintiff relies on previous cases where this court has stated that "[i]f the [insurance policy] is ambiguous, extrinsic evidence may be introduced to support a particular interpretation. . . . If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact." (Internal quotation marks omitted.) *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, 284 Conn. 744, 755, 936 A.2d 224 (2007). The plaintiff further claims that, after examining the extrinsic evidence submitted in support of its motion for summary judgment, we must conclude that it is entitled to summary judgment in its favor.

Although I agree that this court has, in some cases, examined extrinsic evidence to support a particular interpretation when the ambiguity in the policy is based upon a factual determination, this court has also declined to examine extrinsic evidence to interpret ambiguous policy language where the ambiguity in the policy is inherent in the terms of the policy, and has instead construed the ambiguous language against the drafter of the policy. For example, in *Israel* v. *State Farm Mutual Automobile Ins. Co.*, supra, 259 Conn. 512, this court concluded that the language of the insurance policy was ambiguous, and stated that our analysis of such ambiguous language "is governed by the well established principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters, and that ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view. . . . The premise behind the rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter. . . . This canon, commonly styled contra proferentem, is more rigorously applied in the context of insurance contracts than in other contracts." (Citation omitted; internal quotation marks omitted.) Id., 508–509, quoting *Hansen* v. *Ohio Casualty Ins. Co.*, 239 Conn. 537, 544,

687 A.2d 1262 (1996). Accordingly, because the policy language was ambiguous, this court construed the policy language against the insurer, without ever examining extrinsic evidence. *Israel* v. *State Farm Mutual Automobile Ins. Co.*, supra, 512; see also *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 463–65 n.25, 870 A.2d 1048 (2005) (construing ambiguous policy language against insurer without examining extrinsic evidence); *S & S Tobacco & Candy Co.* v. *Greater New York Mutual Ins. Co.*, 224 Conn. 313, 320, 617 A.2d 1388 (1992) (same).

Furthermore, in *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 787, this court determined that a phrase in the insurance policy was ambiguous because it was reasonably susceptible to more than one interpretation. Having concluded that the policy was ambiguous, this court stated: "Thus, having concluded that the relevant policy language is ambiguous, we ordinarily would be free to consider extrinsic evidence, although '[i]f the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact.' . . . The present case is, however, before both the trial court and this court on a statement of stipulated facts, and, accordingly, the language falls into the category of ambiguities 'that cannot be resolved by examining the parties' intentions.' " (Citation omitted.) Id., 788, quoting *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 255 Conn. 306. Accordingly, because interpreting the ambiguous language was a legal, rather than a factual, issue, this court applied the doctrine of contra proferentem and construed the ambiguous language against the insurer.[2] *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 788–89.

In the present case, the facts surrounding the creation of the policy are not in dispute, and the ambiguity arises only from the terms of the policy. Accordingly, I would resolve the ambiguities in the policy language against the drafter, and conclude that the $10 million coverage limit applies separately to professional liability and general liability at each location covered by the policy. See *Allstate Ins. Co.* v. *Barron*, supra, 269 Conn. 406 ("[w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted" [internal quotation marks omitted]). I would, therefore, affirm the judgment of the trial court as to part II of the majority opinion, albeit on different grounds.

Accordingly, I respectfully dissent as to part II of the majority opinion.

[1] I note that the defendants in the present action include Lexington Healthcare Group, Inc., Lexington Highgreen Holding, Inc., Nationwide Health Properties, Inc., and various personal representatives of the injured parties, or the estates thereof, in the underlying action. See footnote 3 of the majority opinion.

[2] Justice Norcott, writing for the majority in *Fontaine*, stated "our interpretation of ambiguous policy language in favor of coverage under the doctrine

of contra proferentem has become near axiomatic in insurance coverage disputes." *Connecticut Ins. Guaranty Assn.* v. *Fontaine,* supra, 278 Conn. 788–89.

———————————————