# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3099

_____

Employers Reinsurance Company,    *
                                             *

            Appellant,         *

                                             *    Appeal from the United States

    v.                                 *    District Court for the

                                             *    Western District of Missouri.

Massachusetts Mutual Life Insurance   *

Company,                           *

                                             *

           Appellee.          *

_____

Submitted: June 14, 2011
Filed: September 7, 2011

_____

Before BYE and MELLOY, Circuit Judges, and ERICKSEN,[1] District Judge.

_____

ERICKSEN, District Judge.

The primary issue in this appeal is whether a reinsurance agreement between Employers Reinsurance Company ("ERC") and Massachusetts Mutual Life Insurance Company ("Mass Mutual") contains a follow-the-settlements provision. Granting

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

partial summary judgment in Mass Mutual's favor, the district court[2] concluded that it does. The district court also concluded that ERC had breached the agreement by offsetting disputed damages. Later, the district court concluded that the statute of limitations barred most of ERC's challenges that survived the conclusion regarding the follow-the-settlements provision. We affirm.

## I.

In late 1992 and early 1993, ERC and Connecticut Mutual Life Insurance Company ("CML") discussed entering into a reinsurance agreement, but they did not reach an agreement at that time. Later in 1993, ERC and CML entered into an Excess Disability Income Reinsurance Agreement ("Treaty"). In 1996, Mass Mutual merged with CML and assumed CML's rights and obligations under the Treaty.

Article I of the Treaty provides that the "agreement applies to loss sustained by the Reinsured [Mass Mutual] under the disability income policies described in the Schedule . . . (hereinafter called policies or policy) as a result of disabilities commencing on or after the effective date and prior to the termination date of this agreement." It also provides that "[t]he date each disability commences shall be determined by the Reinsured in accordance with policy provisions."

Under Article II, Mass Mutual retains a part of the loss, and ERC indemnifies Mass Mutual for a part of the loss:

> RETENTION AND REINSURANCE. As respects loss pertaining to each person as a result of each disability regardless of the number of policies involved, the Reinsured shall retain as its own net retention under this agreement the part thereof indicated in Schedule Item 5, and

---

[2]The Honorable Fernando J. Gaitan, Jr., Chief Judge, United States District Court for the Western District of Missouri.

the Corporation will indemnify the Reinsured against the part of such loss indicated in Schedule Item 6.

. . . .

As respects each disability pertaining to each person, the Corporation shall indemnify the Reinsured for damages to which this agreement may apply by virtue of subparagraph (b) of Article IV in the same proportion that the amount of the loss ultimately borne by the Corporation bears to the total amount of the loss exclusive of such damages.

According to Schedule Items 5 and 6, Mass Mutual retained 100% of the loss for an initial period, Mass Mutual retained 10% of the loss after the initial period, and ERC indemnified Mass Mutual for the remaining 90% of the loss after the initial period.

Article IV defines "loss":

DEFINITION OF LOSS. The word "loss" shall mean only such amounts as are actually paid by the Reinsured for disability benefits afforded under the policies, in settlement of claims for disability benefits under the policies, or in satisfaction of judgments for disability benefits under the policies. The word "loss" includes the amount of premium currently waived under the policies. The word "loss" shall not include:

(a)     claim expenses or salaries paid to employees of the Reinsured;

(b)     punitive, exemplary or compensatory damages arising out of the conduct of the Reinsured in the investigation, trial or settlement of any claim or failure to pay or delay in payment of any benefits under any policy; provided that, this subparagraph (b) shall not apply if the Corporation concurs in the Reinsured's course of conduct;

(c)     any statutory penalty imposed upon the Reinsured on account of any unfair trade practice or any unfair claim practice.

Article IX addresses Mass Mutual's obligation to investigate, pay, settle, or defend claims, and to give notice to ERC of certain claims; ERC's obligation to reimburse Mass Mutual upon receipt of proof of payment; ERC's right to participate in the investigation, adjustment, or defense of certain claims; Mass Mutual's obligation to send to ERC quarterly summaries; and the allocation of lump sum settlements:

CLAIMS. The Reinsured agrees that it will cause to be investigated, paid, settled or defended all claims arising under the policies and that it will give prompt notice to the Corporation of any event or development which, in the judgment of the Reinsured, might result in a claim upon the Corporation hereunder, and will forward promptly to the Corporation copies of such claim documentation as may be requested by the Corporation.

The Corporation shall reimburse the Reinsured or its legal representative promptly for loss against which indemnity is herein provided, upon receipt in the home office of the Corporation of satisfactory evidence of payment of such loss.

The Corporation shall have the right, at its own expense, to participate jointly with the Reinsured in the investigation, adjustment or defense of any claim which, in the judgment of the Corporation, it is or might become exposed.

Within 35 days after the end of each calendar quarter, the Reinsured shall mail to the Corporation a summary of the estimated values for the outstanding claims reinsured by this agreement as of the last day of the quarter.

As respects lump sum settlements, the amount of each settlement shall be divided by the person's monthly benefit and the quotient shall be expressed in months. Loss shall then be allocated between the Reinsured and the Corporation based on this number of months in accordance with Items 5 and 6 of the Schedule.

Article XII sets forth the ability of either Mass Mutual or ERC to offset:

> OFFSET. The Reinsured or the Corporation may offset any balance, whether on account of premiums, commissions, loss or claim expenses due from one party to the other under this agreement or under any other reinsurance agreement heretofore or hereafter entered into between the Reinsured and the Corporation, whether acting as assuming reinsurer or ceding company.

After Mass Mutual had assumed CML's rights and obligations under the Treaty, ERC expressed concerns about its ability to participate in the investigation, adjustment, or defense of claims, and about Mass Mutual's claim adjudication. In 1999, Mass Mutual and ERC agreed to a Pilot Project in which ERC and its representative, Disability Management Services ("DMS"), reviewed disability claim files that were subject to the Treaty and provided recommendations to Mass Mutual. Mass Mutual and ERC did not extend the Pilot Project past its six-month term.

In 2002, Mass Mutual and ERC entered into a Claims Review Agreement ("2002 CRA"). Under the 2002 CRA, Mass Mutual and ERC agreed to allow ERC's representative, DMS, to review claims and to make non-binding recommendations to Mass Mutual. Mass Mutual and ERC agreed that the process envisioned by the 2002 CRA, known as the Engagement, did "not constitute a waiver of any rights or privileges of either party under The Treaty." In their "Engagement Guidelines," they also agreed that Mass Mutual "shall be the final decision-maker in all benefit determinations" and that the "agreement as to procedures for 'The Engagement' does not affect the contractual rights, duties and/or obligations of either party under their Reinsurance Agreement, nor limit any remedies available for either party." Mass Mutual terminated the 2002 CRA.

ERC sought another agreement that would allow a third party to review claim files, and Mass Mutual agreed so long as ERC did not use DMS. In September 2003,

Mass Mutual and ERC entered into a Claims Review Agreement ("2003 CRA") that was similar to the 2002 CRA. Under the 2003 CRA, Mass Mutual and ERC agreed to allow ERC's representative, this time Disability Insurance Specialists, LLC ("DIS"), to review claims and to make non-binding recommendations to Mass Mutual. Mass Mutual and ERC agreed that the Engagement under the 2003 CRA did "not constitute a waiver of any rights or privileges of either party under The Treaty." As in 2002, the Engagement Guidelines provided that Mass Mutual "shall be the final decision-maker in all benefit determinations" and that the "agreement as to procedures for 'The Engagement' does not affect the contractual rights, duties and/or obligations of either party under their Reinsurance Agreement, nor limit any remedies available for either party."

After implementing a new reserve system and a new claim administration system, Mass Mutual notified ERC in September 2004 that it (Mass Mutual) had, over the span of the reinsurance relationship, overcharged ERC $6 million due primarily to misidentification of some claims as "continuing" instead of "new." Mass Mutual also revealed that it had miscalculated, and thus undercharged for, residual benefits under certain policies. Mass Mutual made offsets according to the $6 million calculated overcharge and the undercharge, which amounted to $712,305.

According to ERC's Claims Counsel, the 2003 CRA revealed "serious breaches of the Treaty by Mass Mutual, including mishandling of claims, seeking reimbursement for claims that were not subject to the Treaty, and seeking reimbursements for other amounts not reimbursable under the Treaty." In December 2005, ERC presented twelve claims that it questioned for reimbursement to Mass Mutual. Invoking "follow the fortunes" and "follow the settlements," Mass Mutual rejected ERC's request for reimbursement in late January 2006.

In early March 2006, ERC sued Mass Mutual. ERC claimed that Mass Mutual had breached the Treaty and the implied duty of good faith and fair dealing. ERC

also sought an accounting and a declaration that "ERC is not obligated under the . . . Treaty to follow Mass Mutual's settlement actions." ERC stopped reimbursing Mass Mutual for all claims under the Treaty shortly after the action's commencement. Mass Mutual asserted counterclaims, including one for breach of contract and one for breach of the implied duty of good faith and fair dealing based on ERC's cessation of reimbursements.

Mass Mutual moved for summary judgment on its counterclaim for breach of contract; moved for summary judgment on ERC's claims based on Connecticut's statute of limitations, waiver, estoppel, and laches; and moved for partial summary judgment on ERC's claims on the ground that ERC must follow the fortunes and settlements of Mass Mutual under the Treaty. Seeking a declaration that the Treaty does not contain a follow-the-settlements provision, ERC moved for partial summary judgment. The district court concluded that the Treaty contained an express follow-the-settlements provision, and denied ERC's motion for partial summary judgment, granted Mass Mutual's motion for partial summary judgment, and denied as moot Mass Mutual's motion for summary judgment based on Connecticut's statute of limitations, waiver, estoppel, and laches. The district court stated that "ERC may not question the claims handling practices of Mass Mutual" and that "ERC may only now question those claims that are not covered under the Treaty or that were made in bad faith." Concluding that ERC had breached the Treaty when it stopped reimbursements to Mass Mutual in April 2006, the district court granted Mass Mutual's motion for summary judgment on its counterclaim for breach of contract. The district court also granted summary judgment in Mass Mutual's favor on its counterclaim for breach of the implied duty of good faith and fair dealing, and shortly thereafter ERC reimbursed Mass Mutual for the amounts withheld.

After determining that the Treaty contained a follow-the-settlements provision, the district court ordered ERC to disclose whether it intended to challenge individual reinsured claims on a case-by-case basis and, if so, to identify them and the

underlying theory of liability. Of the claims that ERC intended to challenge on a case-by-case basis, the district court concluded that eight presented "a genuine issue of material fact as to whether Mass Mutual exercised its discretion outside of the Treaty." Later, the district court concluded that Connecticut's statute of limitations barred six of the eight. ERC abandoned the remaining two. After determining the amount of interest due on the reimbursements withheld by ERC from April 2006 to August 2008, the district court entered judgment. On appeal, ERC asserts that the district court erroneously concluded that the Treaty has a follow-the-settlements provision; that the district court erroneously concluded that Connecticut's statute of limitations barred six of its challenges; and that the district court erroneously concluded that ERC had breached the Treaty by stopping reimbursements to Mass Mutual in April 2006.

## II.

"In a diversity action such as this, we apply state substantive law." *Eng v. Cummings, McClorey, Davis & Acho, PLC*, 611 F.3d 428, 432 (8th Cir. 2010). The district court determined, and the parties agree, that Connecticut law governs. "We review de novo a district court's grant of summary judgment, as well as its interpretation of state law and the terms of a contract." *Ace Elec. Contractors, Inc. v. Int'l Bhd. of Elec. Workers, Local Union No. 292*, 414 F.3d 896, 899 (8th Cir. 2005).

### A.

ERC asserts that the district court erroneously concluded that the Treaty has a follow-the-settlements provision. ERC maintains that such a provision is neither expressly nor impliedly in the Treaty, and that the district court improperly resorted to extrinsic evidence.

Under Connecticut law, a court construes a reinsurance treaty to effectuate the intent of the parties as expressed by their words and purposes. *Hartford Accident & Indem. Co. v. Ace Am. Reinsurance Co.*, 936 A.2d 224, 231 (Conn. 2007). Unambiguous terms receive their plain and ordinary meaning. *Id.* A reinsurance treaty's provision is ambiguous when it is reasonably susceptible to more than one reading. *Id.* The issue of whether an ambiguity exists is one of law. *Id.*

> Primary insurers reinsure to diversify risk. The mechanics of reinsurance can be simply described. One insurer (a "ceding insurer") "cedes" all or part of the risk relating to a policy, or a group of policies, to a reinsurer. A portion of risk not "ceded" is "retained." The reinsurer indemnifies the ceding insurer for any liability incurred that is covered by the reinsurance. The relationship created is strictly one of indemnification. The reinsurer has no privity with, and is generally not liable to, the original purchaser of the underlying policy.

*Travelers Indem. Co. v. Scor Reinsurance Co.*, 62 F.3d 74, 76 (2d Cir. 1995). A follow-the-fortunes clause requires "a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured." *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 139-40 (2d Cir. 2004). A follow-the-settlements clause "requires a reinsurer to indemnify a cedent for a settlement as long as that settlement is reasonable and made in good faith." *Id.* at 139. The wording of follow-the-settlements clauses may vary. *See generally* William C. Hoffman, *Common Law of Reinsurance Loss Settlement Clauses: A Comparative Analysis of the Judicial Rule Enforcing the Reinsurer's Contractual Obligation to Indemnify the Reinsured for Settlements*, 28 Tort & Ins. L.J. 659, 660 n.1 (1993).

Discerning no ambiguity in the Treaty, we conclude that it contains a follow-the-settlements provision.[3]   Article I of the Treaty provides that the "agreement applies to loss sustained by [Mass Mutual] under the disability income policies described in the Schedule . . . (hereinafter called policies or policy) as a result of disabilities commencing on or after the effective date and prior to the termination date of this agreement." Under Article II, ERC "will indemnify [Mass Mutual] against the part of such loss indicated in Schedule Item 6." Article IX states that ERC "shall reimburse [Mass Mutual] promptly for loss against which indemnity is herein provided, upon receipt in the home office of the Corporation of satisfactory evidence of payment of such loss." Article IV defines "loss" to "mean only such amounts as are actually paid by [Mass Mutual] for disability benefits afforded under the policies, in settlement of claims for disability benefits under the policies, or in satisfaction of judgments for disability benefits under the policies." Thus, ERC agreed to promptly reimburse Mass Mutual for a part of amounts actually paid by Mass Mutual for disability benefits afforded under the policies, in settlement of claims for disability benefits under the policies, or in satisfaction of judgments for disability benefits under the policies.

---

[3]We have no occasion here to precisely distinguish "follow the fortunes" from "follow the settlements." *Cf. ReliaStar Life Ins. Co. v. IOA Re, Inc.*, 303 F.3d 874, 878 n.3 (8th Cir. 2002) ("We note that the case law and the analysis of certain scholarly works disagree as to the exact scope and meaning of the 'follow-the-fortunes' doctrine. . . . [W]e do not endeavor to resolve the ambiguities noted in these sources."); 1A Steven Plitt et al., *Couch on Insurance* § 9:25 n.1 (3d ed. 2010) (noting that many courts refer to the concept of following settlements, "somewhat confusingly, as part of the 'follow the fortunes clause'"). Before the district court, ERC noted that "[c]ourts have frequently used the terms 'follow the fortunes' and 'follow the settlements' interchangeably, although 'follow the settlements' is more precisely a subset of the 'follow the fortunes' doctrine." ERC used "follow the settlements" to refer to both "follow the settlements" and "follow the fortunes" before the district court and on appeal. Similarly, Mass Mutual has used "follow the fortunes" to refer to both "follow the settlements" and "follow the fortunes."

We are not persuaded by ERC's assertion that reimbursable loss does not extend to payments or settlements made by Mass Mutual to its insureds that are beyond the benefits afforded under the policies. "Loss" under the Treaty does include amounts that Mass Mutual pays "for disability benefits afforded under the policies," but it also includes amounts that Mass Mutual pays "in settlement of claims for disability benefits under the policies." A claim for disability benefits under a policy might be covered by the policy, or it might not. Amounts paid by Mass Mutual in settlement of such a claim unambiguously constitute reimbursable loss, subject to ERC's well established, limited ability to challenge Mass Mutual's coverage decision. *See, e.g.*, *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 149 (3d Cir. 2010) ("[A] reinsurer seeking to avoid payment must show either that the coverage decisions that led to the reinsurer's liability to the insurer were made in bad faith, or that the coverage provided clearly fell outside the scope of the policies the reinsurer agreed to reinsure."); *Am. Employers' Ins. Co. v. Swiss Reinsurance Am. Corp.*, 413 F.3d 129, 132 (1st Cir. 2005) ("The certificates also contained 'follow-the-fortunes' provisions, often described as 'follow-the-settlements' provisions. They preclude the reinsurer from challenging a cedent's decision to settle so long as the settlement is 'reasonably within the terms of the [cedent's] policy, even if not technically covered by it' and so long as the cedent has acted in good faith." (alteration in original)); *N. River Ins.*, 361 F.3d at 139-40 (stating that follow-the-fortunes doctrine "insulates a reinsured's liability determinations from challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are 'clearly beyond the scope of the original policy' or "in excess of [the reinsurer's] agreed-to exposure'" (alteration in original) (quoting *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir. 1992))).

We reject ERC's assertion that the district court improperly resorted to extrinsic evidence. In concluding that the Treaty contains a follow-the-settlements provision, the district court stated that the Treaty was unambiguous and that extrinsic

evidence was unnecessary. Finally, having concluded that the Treaty unambiguously requires ERC to follow the settlements of Mass Mutual, we express no opinion as to whether follow the settlements is an implied term of the Treaty under Connecticut law.

## B.

ERC contends the district court erroneously concluded that Connecticut's six-year limitations period, Conn. Gen. Stat. § 52-576(a), barred ERC's challenges to several claims submitted by Mass Mutual.[4] "'The question of whether a party's claim is barred by the statute of limitations is a question of law, which [we review] de novo." *Watts v. Chittenden*, 22 A.3d 1214, 1219 (Conn. 2011) (quoting *Certain Underwriters at Lloyd's, London v. Cooperman*, 957 A.2d 836, 850 (Conn. 2008)).

ERC first contends that Article VII of the Treaty constitutes a tolling agreement. The district court found no ambiguity in Article VII and concluded that the article's plain language revealed no intent to toll the statute of limitations. Article VII provides:

> REINSURANCE PREMIUM ADJUSTMENT. The first reinsurance premium adjustment for each liability period shall be made one year after the close of the liability period. Reinsurance premium adjustment for each liability period shall be made annually thereafter until all losses resulting from disabilities commencing during the liability period and during each preceding liability period and for which [ERC] is liable shall have been paid.

---

[4]We decline to consider ERC's assertion that the statute of limitations does not bar its challenges "as a matter of fact" because ERC raised the issue for the first time on appeal in its reply brief. *See Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 911 n.4 (8th Cir. 2010).

-12-

. . . .

> Reinsurance premium adjustments shall continue after the termination date of this agreement and the event of termination of this agreement shall not affect [ERC's] obligation under this article to return reinsurance premium or [Mass Mutual's] obligation under this article to pay additional reinsurance premium.

Article VII provides for annual reinsurance premium adjustments that continue after the Treaty's termination, but we agree with the district court that nothing in Article VII indicates that the parties agreed to toll the statute of limitations.[5]

ERC next argues that Mass Mutual's continuing course of conduct tolled the statute of limitations. The district court concluded that tolling of the statute of limitations pursuant to a continuing course of conduct would not be proper under Connecticut law.

"Connecticut courts . . . have recognized that where there is a continuing course of conduct constituting a breach of duty, the limitations period does not begin to run, or is tolled, until that conduct terminates." *City of W. Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 545 (2d Cir. 1990). "To support a finding of a 'continuing course of conduct' that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto." *Fichera v. Mine Hill Corp.*, 541 A.2d 472, 474 (Conn. 1988). "Where [the Connecticut Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the 'act or omission' relied upon, there has been evidence of either a special relationship between the parties giving rise to such a

---

[5]The language of Article VII differs substantially from the language considered in the cases on which ERC relies. *See Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160-61 (2d Cir. 2003); *SEC v. DiBella*, 409 F. Supp. 2d 122, 129 (D. Conn. 2006).

-13-

continuing duty or some later wrongful conduct of a defendant related to the prior act." *Id.* "The issue . . . of whether a party engaged in a continuing course of conduct that tolled the running of the statute of limitations is a mixed question of law and fact." *Giulietti v. Giulietti*, 784 A.2d 905, 925 (Conn. App. Ct. 2001).

The district court carefully analyzed the issue of whether the statute of limitations could be tolled under Connecticut law on the basis of a continuing course of conduct by Mass Mutual. We agree with the district court's analysis of Connecticut law and its reading of *Vanliner Insurance Co. v. Fay*, 907 A.2d 1220 (Conn. App. Ct. 2006), where the defendant's conduct prevented the plaintiff from taking action to remedy the initial breach. 907 A.2d at 1231. ERC does not contest the district court's conclusion that there was no special relationship between ERC and Mass Mutual, and we do not discern a triable issue of fact with respect to whether Mass Mutual engaged in subsequent wrongful conduct that would toll the statute of limitations under Connecticut law. We agree with the district court that Mass Mutual's conduct–none of which would have prevented an earlier commencement of a lawsuit–does not give rise to tolling under Connecticut law. *Cf. Blanchette v. Barrett*, 640 A.2d 74, 85 (Conn. 1994) ("The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied."), *overruled on other grounds by Grey v. Stamford Health Sys., Inc.*, 924 A.2d 831 (Conn. 2007); *Sanborn v. Greenwald*, 664 A.2d 803, 808 (Conn. App. Ct. 1995) ("The doctrine of continuing course of conduct as used to toll a statute of limitations is better suited to claims where the situation keeps evolving after the act complained of is complete . . . rather than one where the situation cannot change . . .").

Finally, ERC asserts that the district court erred by concluding that a cause of action alleging a breach of contract on the theory that the claim is not reinsured accrues when it is ceded to the reinsurer. Analogizing to installment contracts, ERC asserts that a new cause of action accrues each time that Mass Mutual submits a

-14-

request for reimbursement. We do not find a basis in Connecticut law for treating ERC's challenges to Mass Mutual's reimbursement requests for accrual purposes as installment contracts. *Cf. Fleet Nat'l Bank v. Lahm*, 861 A.2d 545, 548 (Conn. App. Ct. 2004).

The Connecticut Supreme Court "has stated that '[i]n an action for breach of contract . . . the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted.' Although the application of this rule may result in occasional hardship, '[i]t is well established that *ignorance of the fact that damage has been done does not prevent the running of the statute*, except where there is something tantamount to a fraudulent concealment of a cause of action.'" *Tolbert v. Conn. Gen. Life Ins. Co.*, 778 A.2d 1, 5 (Conn. 2001) (alterations in original) (citations omitted). "[T]he occurrence of an act or omission—whether it is a breach of contract or of duty—that causes a direct injury, however slight, may start the statute of limitations running against the right to maintain an action even if the plaintiff is not aware of the injury, and even if all resulting damages have not yet occurred; it is sufficient if nominal damages are recoverable for the breach or for the wrong, and where that is the case, it is unimportant that the actual or substantial damage is not discovered or does not occur until later." *Burke v. Klevan*, 23 A.3d 95, 98-99 (Conn. App. Ct. 2011); *see Amoco Oil Co. v. Liberty Auto & Elec. Co.*, 810 A.2d 259, 266 (Conn. 2002). The six claims that were dismissed pursuant to the statute of limitations were submitted by Mass Mutual to ERC more than six years before ERC brought this action. We agree that the statute of limitations bars ERC's challenges to the six claims. *See* Conn. Gen. Stat. § 52-576(a) ("No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues . . . .").

## C.

Mass Mutual asserted counterclaims for breach of contract and for breach of the implied covenant of good faith and fair dealing based on ERC's cessation of

reimbursements shortly after this action's commencement. ERC asserts that the district court erroneously granted summary judgment to Mass Mutual on the two counterclaims.

ERC contends that it did not breach the Treaty. *See Keller v. Beckenstein*, 979 A.2d 1055, 1060 (Conn. App. Ct. 2009) (summarizing elements of cause of action for breach of contract). It maintains that, when it stopped all reimbursements to Mass Mutual in April 2006, it was complying with the plain and unambiguous offset provisions of Article XII. Article XII indeed provides that either ERC or Mass Mutual "may offset any balance, whether on account of premiums, commissions, loss or claim expenses due from one party to the other." The district court determined, however, that a balance is not "due" under this provision if the balance is in fact contested. We agree: no fair reading of this provision would permit ERC to cease all reimbursements on the basis of its own unilateral conclusion that Mass Mutual had improperly submitted claims in the past.

ERC also maintains that it did not breach the implied duty of good faith and fair dealing when it withheld payments. Connecticut recognizes an implied covenant of fair dealing: "It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Hoskins v. Titan Value Equities Grp., Inc.*, 749 A.2d 1144, 1146 (Conn. 2000). "In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004) (internal quotation marks omitted). "'To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.'" *Id.* (alteration in original) (quoting *Alexandru v. Strong*, 837 A.2d 875, 883 (Conn. App. Ct. 2004)). "[B]ad faith may include one party's performance or interpretation of the contract in a manner that evades its spirit and is unfaithful to its purpose, resulting in a denial of the justified

expectations of the other party." *Landry v. Spitz*, 925 A.2d 334, 345 (Conn. App. Ct. 2007). "Whether a party has acted in bad faith is a question of fact . . . ." *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.*, 915 A.2d 290, 298 (Conn. 2007). ERC unilaterally withheld all reimbursements to Mass Mutual for more than two years. The district court properly concluded that there was no genuine issue that this did not constitute good faith or fair dealing.

III.

Accordingly, we affirm.

_____