# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3625

_____

| | | |
|---|---|---|
| Best Buy Stores, L.P., | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Benderson-Wainberg Associates, L.P.; | * | Appeals from the United States |
| DDR Flatiron LLC; DDR Hendon | * | District Court for the |
| Nassau Park II, LP; DDR MDT Cool | * | District of Minnesota |
| Springs Point LLC; DDR MDT Great | * | |
| Northern, LLC; DDR MDT Lakepointe | * | |
| Crossing, LP; DDR MDT Riverdale | * | |
| Village Outer Ring, LLC; DDR MDT | * | |
| Shoppers World LLC; DDRA | * | |
| Ahwatukee Foothills, LLC; DDRC | * | |
| PDK Salisbury LLC; DDR MDT | * | |
| Fayetteville Spring Creek, LLC; DDR | * | |
| MDT Turner Hill Marketplace, LLC; | * | |
| JDN Realty Corporation; BG Boulevard | * | |
| III, LLC, a Delaware Limited Liability | * | |
| Corporation, | * | |
| | * | |
| Defendants - Appellants, | * | |
| | * | |
| Developers Diversified Realty | * | |
| Corporation; JDN Development | * | |
| Company, Inc.; John Doe, #1, | * | |
| | * | |
| Defendants. | * | |

_____

No. 10-3627

_____

Best Buy Stores, L.P.,                            *
                                                  *
      Plaintiff - Appellant,        *
                                                  *
v.                                                *
                                                  *
Developers Diversified Realty              *
Corporation; Benderson-Wainberg            *
Associates, L.P.; DDR Flatiron LLC;        *
DDR Hendon Nassau Park II, LP;             *
DDR MDT Cool Springs Point LLC;            *
DDR MDT Great Northern, LLC;               *
DDR MDT Lakepointe Crossing, LP;           *
DDR MDT Riverdale Village Outer            *
Ring, LLC; DDR MDT Shoppers                *
World LLC; DDRA Ahwatukee                   *
Foothills, LLC; DDRC PDK Salisbury         *
LLC; DDR MDT Fayetteville Spring           *
Creek, LLC; DDR MDT Turner Hill            *
Marketplace, LLC; JDN Realty               *
Corporation; BG Boulevard III, LLC,        *
a Delaware Limited Liability               *
Corporation,                               *
                                                  *
      Defendants - Appellees,        *
                                                  *
JDN Development Company, Inc.;              *
John Doe, #1,                              *
                                                  *
      Defendants.                   *

_____

Submitted: October 18, 2011
Filed: February 21, 2012
_____

Before MURPHY, BYE, and SMITH, Circuit Judges.
_____

SMITH, Circuit Judge.

Best Buy Stores, L.P. ("Best Buy") sued various commercial landlords[1] (collectively, "Landlords") and the Landlords' property manager, Developers Diversified Realty Corporation (DDRC), alleging that DDRC impermissibly charged Best Buy for insurance-related costs under various lease agreements. The Landlords argued that the leases did permit these charges and asserted various equitable defenses arguing that Best Buy had waived its objection to those charges. Best Buy moved for summary judgment on its breach of contract, declaratory judgment, and breach of fiduciary duty claims. The Landlords filed a cross motion for partial summary judgment against Best Buy's breach of contract claim. The district court granted Best Buy's motion for summary judgment on its breach of contract and declaratory judgment claims. The district court also granted the Landlords' motion for summary judgment on Best Buy's breach of fiduciary duty claim and some of Best Buy's fraud claims. The district court then awarded damages to Best Buy, allowing

_____

[1]DDRA Ahwatukee Foothills, L.L.C. ("Ahwatukee"); DDR MDT Fayetteville Spring Creek, L.L.C. ("Spring Creek"); DDR Flatiron, L.L.C. ("Flatiron"); JDN Realty Corporation; DDR MDT Turner Hill Marketplace, L.L.C. ("Turner Hill"); DDR PDK Salisbury, L.L.C. ("Salisbury"); DDR MDT Shoppers World, L.L.C. ("Shoppers World"); DDR MDT Riverdale Village Outer Ring, L.L.C. ("Riverdale"); DDR Hendon Nassau Park II, L.P. ("Nassau Park"); Benderson-Wainberg Associates, L.P. ("B-W"); BG Boulevard III, L.L.C. ("Boulevard"); DDR MDT Great Northern, L.L.C. ("Great Northern"); DDR MDT Cool Springs Pointe, L.L.C. ("Cool Springs"); DDR MDT Lakepointe Crossing, L.P. ("Lakepointe") (collectively, the "Landlords").

it to recoup the amount it paid for the insurance to the Landlords with pre-judgment interest. Both parties appeal. For the reasons explained below, we affirm in part, and reverse in part.

## I. *Background*

Since 1998, Best Buy has leased commercial real estate space from DDRC, a publicly traded real estate investment trust that owns and manages shopping centers. Under various lease agreements, Best Buy rented 15 retail properties from the Landlords.[2]

Although not uniform, the leases generally required the Landlords to obtain property and liability insurance for the common areas of the shopping centers. In turn, the leases required Best Buy to reimburse the Landlords for the cost of purchasing this insurance. Attempting to comply with these provisions, DDRC purchased blanket insurance policies with high deductibles, typically $100,000, from third-party commercial insurance companies for all of the properties that it managed. DDRC then assumed the risks of the high deductible. As compensation for assuming this risk, DDRC charged the Landlords what it believed to be a reasonable premium. The Landlords then passed this premium charge on to Best Buy. DDRC named this arrangement the "First Dollar Program."

At the beginning of each lease year, DDRC sent Best Buy prospective budgets for the estimated costs associated with leasing space in the various facilities. DDRC then billed Best Buy in accordance with those budgets. After each billing year, DDRC would send Best Buy reconciliation documents. In these documents, DDRC would either request additional payments if the actual costs exceeded the budget or credit Best Buy for overpayments if the costs were lower than the budget. While the

---

[2]While DDRC wholly-owns many of the above landlords, it manages all of the above properties pursuant to management agreements as a distinct legal entity.

reconciliation documents noted the costs for insurance, including the First Dollar Program, they did not explain how DDRC calculated this cost. As the district court noted:

> The reconciliation documents for the 1998 and 1999 lease years noted that the insurance allocations "include premiums collected by Mesirow Insurance Services and funding for large deductibles collected by DDRC." That language was altered in the 2000 and 2001 lease years to provide that the insurance allocations "include premiums and funding for large deductibles. Premiums are collected by Mesirow Insurance Services. Funding for large deductibles [is] collected by DDRC." In 2002 and 2003, DDRC included a separate line item identifying the "deductible cost." In addition, the reconciliation documents noted that "[i]nsurance company costs collected by Mesirow Insurance Services. Self-Insured Deductible costs charged for and collected by DDRC." The 2004 reconciliation documents provided a "First Dollar Program Cost Summary." This summary identified the charges for the first dollar premiums and noted that DDRC's "program provides first dollar coverage to Tenants for incurred General Liability and Property losses. In the event of an insured loss, incurred losses are not charged back to a Tenant but retained by [DDRC]."

*Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 636 F. Supp. 2d 869, 875–76 (D. Minn. 2009) (record citations omitted).

For the 2004 and 2005 lease years, DDRC created two captive insurance companies, American Property Protection Company (APPC) and National Property Protection Company (NPPC).[3] These companies provided coverage under the First Dollar Program. Thus, DDRC paid premiums to its captive insurance companies for

---

[3]The captive insurance companies were formed as "pure captive" companies under Vermont law, which defines such companies as "any company that insures risks of its parent and affiliated companies or controlled and unaffiliated business." Vt. Stat. Ann. tit. 8, § 6001(14).

insuring the within-deductible risk and billed the Landlords for these premiums. The Landlords, in turn, billed Best Buy its pro rata share of the premiums.[4]

As early as March 3, 1999, Best Buy received a 1998 memorandum from DDRC explaining the First Dollar Program (the "1998 Memorandum"). The 1998 Memorandum stated:

> In addition to the standard variables considered by the insurer to establish the premium for the public liability and property damage coverage, [DDRC] has been able to negotiate significant reductions of the premium by agreeing to self fund the first $100,000 of public liability claims, inclusive of attorney fees, court costs and related expenses, and the first $25,000 of property loss, before the insurer would be required to pay any excess loss. . . . Because of its obligation to self fund the initial $100,000 of public liability claims and $25,000 of property damage claims, [DDRC] is given more control over the administration and resolution of its claims which helps to maintain the lower premium regardless of fluctuations in the marketplace. This self-funded coverage, while similar to a deductible, is not, in fact, a deductible. . . .
>
> While [DDRC] has assumed 100% of the risk for self-funded and uninsured losses, this risk is not passed on to the shopping center tenants who are obligated to reimburse the landlord its pro[]rata share of insurance. Instead, [DDRC] includes in its insurance billing to its tenants a self-funded allocation which is intended to compensate [DDRC] for assuming 100% of the risk for self-funded and uninsured

---

[4]To avoid losing its special tax status as a real estate investment trust, DDRC took certain measures to ensure that no actual risk transfer occurred between the captive insurance companies and the properties that DDRC only partially owned. First, DDRC limited the captive insurance companies' payment obligations to the amount of premiums received. Second, DDRC placed an aggregate cap on the amount of losses covered by the captive insurance companies. Third, DDRC guaranteed any claims that the captive insurance companies could not pay.

loss. However, the aggregate cost of the premium and the self-funded allocation is less than the cost for first dollar coverage for each property on a "stand alone" basis (i.e. insurance quoted on a single property basis rather than a blanket policy basis for multiple properties) under a standard commercial policy with no self-funded reimbursement obligation by the insured. It should also be noted that while many insurance companies may be willing to quote a price for first dollar or higher deductible coverage, most insurance companies are unwilling to actually issue a policy of this nature due to the higher risks involved in insuring only a single property. Additionally, tenants should be made aware that its pro[]rata share of the premium and self-funded allocation is the only insurance obligation the tenant is required to pay during the fiscal year. Most landlords who maintain standard commercial insurance policies with deductibles will include with the annual common area maintenance ("CAM") charge any dollars the landlord is required to pay for legal expense and/or deductible payments in addition to the prorata share of the higher premium. Therefore, the tenant pays its pro[]rata share of the premium, plus any out-of-pocket expenses incurred by the landlord to pay the deductible portion of coverage and legal expenses, if applicable. This amount is not fixed and could significantly increase the tenant's CAM charge.

Best Buy paid its rent and associated costs, including the premiums for the First Dollar Program, from 1999 until it received a judgment from the district court in 2009.

Starting in 2000, to ensure timely rental payments and avoid default, Best Buy began sending standard form objection letters with its rental payments to the Landlords, noting that the property leases may be subject to a more thorough audit in the future. The letter stated that "if Tenant is required to object to the reconciliation in order to preserve the right to audit, please allow this notice to serve as said objection, pursuant to the terms of the Lease." The letters also stated:

It is understood and agreed that this payment shall not be deemed as an approval of inappropriate charges that are inconsistent with the provisions of the Lease, charges that may require specific approval, or the manner and method which Best Buy's share of expenses has been calculated. It is agreed that by accepting the payment enclosed, Best Buy preserves any and all audit rights it may have, including all rights in our Lease or Operating Agreement.

Best Buy noted that this post-payment audit system could take more than two years to complete.

In 2000, Best Buy twice requested information related to the insurance charges, including the First Dollar Program. It did not receive any of the requested information, and on September 28, 2004, Best Buy wrote to DDRC, explaining that it had repeatedly attempted, without success, to obtain backup information for the insurance charges during the previous years. In the letter, Best Buy requested invoices showing the premium amounts for the regular and umbrella policies, proof of the actual claim costs incurred, data showing the calculation of developed and trended losses, a detailed explanation of handling and administrative expenses, a list of all policies of insurance and the properties covered, and a copy of the relevant portions of each policy. DDRC did not produce this information until after this litigation commenced.

In 2005, Best Buy sued the Landlords for breach of contract and fraud for the allegedly impermissible charges imposed by the Landlords under the First Dollar Program. Best Buy argued that the First Dollar Program did not constitute insurance as contemplated by the leases. Best Buy moved for summary judgment on its breach of contract claim, arguing that the Landlords could not properly charge Best Buy for the First Dollar Program under the leases. The Landlords countered by arguing that the term "insurance" is ambiguous and that a reasonable jury could find that the First Dollar Program falls within the ordinary meaning of that term. The Landlords further

argued that Best Buy waived its breach of contract claim because it continued to pay for the First Dollar Program despite being put on notice in 1999 by the 1998 Memorandum.

The district court rejected the Landlords' arguments and granted Best Buy's motion for summary judgment on its breach of contract claims for the 1999–2005 lease years. The district court also granted Best Buy additional relief for the 2006–2009 lease years. The district court then entered a judgment for the 1999–2005 lease years and awaited further briefing regarding damages for the 2006–2009 lease years. The district court subsequently denied the Landlords' request for discovery on the 2006–2009 lease years.

To expedite the case and to collect its judgment, Best Buy moved to dismiss its remaining fraud claims on the condition that it could reassert them if the Landlords were successful on appeal. Although Best Buy sought dismissal without prejudice, the district court dismissed Best Buy's fraud claims with prejudice. The district court then entered the judgment for the 2006–2009 lease years, and the Landlords now appeal. Best Buy cross-appeals, arguing the district court applied the incorrect pre-judgment interest rate to its damage awards and erroneously dismissed its fraud claims with prejudice.

## II. *Discussion*

"In a diversity action such as this, we apply state substantive law." *Emp'rs. Reinsurance Co. v. Mass. Mut. Life Ins. Co.*, 654 F.3d 782, 789 (8th Cir. 2011) (quotation and citation omitted). "We review de novo a district court's grant of summary judgment, as well as its interpretation of state law and the terms of a contract." *Id.* (quotation and citation omitted). "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law.'" *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 416 (8th Cir. 2010) (quoting Fed. R. Civ. P. 56(c)(2)).

## A. *Best Buy's Breach of Contract Claim*

The Landlords argue that the district court erred in granting Best Buy's motion for summary judgment on its breach of contract claims. While various choice-of-law provisions apply to the 15 different leases, Minnesota contract law is materially similar to all the other relevant states' contract laws.[5] "Under Minnesota law, [g]eneral

---

[5]As the district court noted, the leases are controlled by various choice-of-law provisions. All but Arizona and Colorado—which also permit extrinsic evidence in contract interpretation to determine contract ambiguity—are materially similar to Minnesota:

> The lease agreements for the following properties contain choice-of-law provisions that require application of various states' laws to all of Best Buy's claims: Ahwatukee (Arizona); Spring Creek (Arkansas); Flatiron (Colorado); JDN Douglasville, Turner Hill (Georgia); Shoppers World (Massachusetts); Riverdale (Minnesota); Great Northern (Ohio); Lakepointe (Texas). Consistent with the court's choice-of-law analysis in the December 2006 order, the court applies Minnesota law to the remaining defendants unless an outcome determinative conflict exists between the laws of Ohio and Minnesota. (Doc. No. 177 at 13–16.) Nevertheless, the court states only Minnesota contract interpretation law because, with the two exceptions . . . [,Arizona and Colorado], the other relevant states apply materially similar principles. *See Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 132 P.3d 825, 828 (2006); *Health Res. of Ark. v. Flener*, 374 Ark. 208, 211, 286 S.W.3d 704 (Ark. 2008); *Hoang v. Assur. Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007); *Boardman Petroleum v. Federated Mut. Ins. Co.*, 269 Ga. 326, 498 S.E.2d 492, 494 (1998); *Ucello v. Cosentino*, 354 Mass. 48, 235 N.E.2d 44, 47 (1968); *City of St. Marys v. Auglaize County Bd. of Comm'rs*, 115 Ohio St.3d 387, 875 N.E.2d 561, 566 (2007); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

principles of contract interpretation apply to insurance policies." *W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 436 (8th Cir. 2011) (alteration in original) (quotation and citation omitted). "We must interpret clear and unambiguous policy language according to plain, ordinary sense so as to effectuate the intentions of the parties." *Id.* (quotation and citation omitted). "Language in a policy is ambiguous if it is susceptible to two or more *reasonable interpretations*." *Id.* (emphasis added).

The Landlords argue that the district court erred in finding that the 15 leases required the Landlords to purchase "insurance . . . from third-party commercial insurance companies." *See Best Buy Stores, L.P.*, 636 F. Supp. 2d at 883. They argue that because the leases do not define the type of insurance that the Landlords had to provide, the First Dollar Program fits within the leases' broad definition of insurance. Yet, the Landlords conceded at oral argument that any interpretation of the leases must be reasonable. *See W3i Mobile, LLC*, 632 F.3d at 436.

1. *The Lack of Capitalization Requirements Make the Landlords' Interpretation Unreasonable*

---

*Best Buy Stores, L.P.*, 636 F.Supp.2d at 878 n.14.

> Arizona and Colorado permit a court to consider extrinsic evidence to determine whether a contract is ambiguous. *See, e.g.*, *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134, 1140 (1993) (court considers extrinsic evidence offered to interpret contract if contract language is "'reasonably susceptible' to the interpretation asserted by its proponent"); *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005) ("[E]xtrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous." (citation omitted)).

*Id.* at 879 n.15.

Each of the leases requires liability insurance to cover shopping center common areas. The First Dollar Program simply does not fit the bill. The Landlords' interpretation fails because it leads to commercially unreasonable results. The Riverdale, Spring Creek, and Shoppers World leases are illustrative. Each of those leases expressly authorized the landlord to use the First Dollar Program to meet its insurance obligations.[6] These leases also required the landlords to meet substantial capitalization requirements under the First Dollar Program. Specifically, the leases required DDRC to maintain a net worth of $100,000,000. None of the three landlords argue that DDRC met this capitalization requirement. Thus, these three landlords failed to comply with the specific provisions of their lease by using the First Dollar Program without complying with the corresponding capitalization requirements.

The First Dollar Program also falls short on the remaining 12 leases that have no specific capitalization amount requirement. Under the Landlords' interpretation of these remaining leases, the individual landlords could meet their insurance obligation under the commercial real estate lease by self-insuring without any capitalization requirements whatsoever. In other words, the Landlords argue that they complied with the contract as long as they were able to find a third-party willing to take on the risk left by the high deductible. This interpretation of the lease would lead to absurd results that commercially reasonable parties could not have intended. For example, under the Landlords' theory, a landlord could have purchased "insurance" from a bankrupt individual as long as the bankrupt individual agreed to assume the risk left by the high deductible in exchange for some sort of premium. This bankrupt individual obviously might lack capacity to cover the costs of incidents arising in the common area because of his or her insolvency; nonetheless, the Landlords argue that such an arrangement satisfies their lease obligations. This is not a reasonable interpretation of these commercial real estate leases, and we decline to interpret them

---

[6]These leases also permitted the landlords to meet the insurance obligations by purchasing commercial liability insurance for the common areas.

in such a manner. We find the more plausible interpretation of "insurance" under the lease to mean something other than the First Dollar Program. Thus, the district court did not err in deciding that the Landlords breached their various lease agreements by charging Best Buy for the First Dollar Program in an attempt to meet its insurance obligations under the leases.

2. *The Landlords Breached the Unambiguous Language of the Leases*

We also hold that the Landlords breached the express terms of the different leases.

Many of the leases required the Landlords to name Best Buy as an additional insured, which those landlords did not do. *See* Turner Hill lease Article 22.2; JDN Douglasville lease Article 22.2; Flatiron lease Article 22.6; Lakepointe lease Article 22.2; Wrangleboro Consumer Square lease Article 22.2; Boulevard lease Article 22.2; Salisbury lease Article 14. Thus, even if the First Dollar Program was valid, the landlords breached their leases by not naming Best Buy as an additional insured.

Article 12 of the JDN Overlook lease required that the landlord procure insurance from a company allowed to do business in Tennessee. We read this language to mean a company licensed to sell insurance in the State of Tennessee. Because DDRC is not a licensed insurance company, the landlord did not comply with the unambiguous terms of that lease.

Article 9H of the Ahwatukee lease expressly mentions insurance provided by an "insurance carrier." Because DDRC is not an insurance carrier, as it conceded in its brief and at oral argument, the landlord did not comply with the lease.

Section 9.6 of the Great Northern lease required the landlord to purchase an insurance policy. We read this language to require a policy from a licensed insurance company. Because the First Dollar Program was not a policy from a licensed

insurance company, it was not an insurance policy, and the landlord did not comply with the unambiguous terms of the lease by treating it as such.

The Nassau Park and Cool Springs leases required Best Buy to pay for insurance premiums. *See* Nassau Park lease Article 23.2; Cool Springs lease Article 23(b). We read this language as referring to insurance premiums paid to a licensed insurance company. Because the First Dollar Program premiums were not charged by a licensed insurance company, they were not insurance premiums within the unambiguous terms of the lease.

Finally, the Riverdale, Spring Creek, and Shoppers World leases authorized the landlords to meet their insurance obligations under the First Dollar Program as long as the landlords met specific capitalization requirements. *See* Riverdale lease Article 22.2; Spring Creek lease Article 22.2; Shoppers World lease Article 22.2. The landlords did not meet those requirements; thus, they did not comply with the unambiguous terms of the lease.

Based on the unambiguous language of the leases, we find the Landlords' interpretation of the leases to be unreasonable. Because the Landlords breached the leases, we find that the district court did not err in determining that the Landlords breached their contracts with Best Buy.

B. *The Landlords' Equitable Defenses*

The Landlords argue that even if they breached the leases, the district court erred in granting summary judgment to Best Buy on its breach of contract claims.

The Landlords raise four equitable defenses—equitable estoppel, waiver, voluntary payment, and account stated. While different choice-of-law provisions apply to the various leases, the elements of each of the defenses claim are materially similar to Minnesota law.

-14-

To state a defense for equitable estoppel:

1. There must be conduct[,] acts, language[,] or silence amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. * * * 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse, in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.

*Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771, 777 (Minn. 2004) (third alteration in original) (quotation and citation omitted).[7]

"[W]aiver is the intentional relinquishment of a known right." *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 367 (Minn. 2009) (quotation and citation

---

[7]*See also Valencia Energy Co. v. Ariz. Dep't of Revenue*, 959 P.2d 1256, 1267–70 (Ariz. 1998); *Sterne, Agee & Leach, Inc v. Way*, 270 S.W.3d 369, 374 (Ark. App. 2007); *Thurman v. Tafoya*,895 P.2d 1050, 1058 (Colo. 1995); *Noons v. Holiday Hospitality Franchising, Inc.*, 705 S.E.2d 166, 168 (Ga. App. 2010); *Boylston Dev. Grp., Inc. v. 22 Boylston St. Corp.*, 591 N.E.2d 157, 163–64 (Mass. 1992); *Culp v. Marshall & Melhorn*, 729 N.E.2d 1240, 1243 (Ohio Ct. App. 1999); *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998).

omitted).[8] Therefore, a valid waiver requires both (1) knowledge of the right and (2) an intent to waive the right. *Stephenson v. Martin*, 259 N.W.2d 467, 470 (Minn. 1977) (per curiam). Waiver may be express or implied; "knowledge may be actual or constructive and the intent to waive may be inferred from conduct." *Valspar Refinish, Inc.*, 764 N.W.2d at 367 (quotation and citation omitted).

"The voluntary payment doctrine is a long-standing doctrine of law, which clearly provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment." *Hanson v. Tele-Commc'ns, Inc.*, No. C7-00-534, 2000 WL 1376533, at *3 (Minn. Ct. App. Sept. 26, 2000) (unpublished).[9]

"An account stated is a manifestation of assent by a debtor and creditor to a stated sum as an accurate computation of an amount due the creditor." *Mountain*

---

[8]*See also Verma v. Stuhr*, 221 P.3d 23, 36 (Ariz. Ct. App. 2009); *City of Ft. Smith v. McCutchen*, 279 S.W.3d 78, 81 (Ark. 2008); *Dep't of Health v. Donahue*, 690 P.2d 243 (Colo. 1984); *Young v. Oak Leaf Builders, Inc.*, 626 S.E.2d 240, 243 (Ga. Ct. App. 2006); *Dynamic Mach. Works, Inc. v. Mach. & Elec. Consultants, Inc.*, 831 N.E.2d 875, 879 (Mass. 2005); *State ex rel. Wallace v. State Med. Bd. of Ohio*, 732 N.E.2d 960, 965 (Ohio 2000); *In re General Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (per curiam).

[9]*See also Moody v. Lloyd's of London*, 152 P.2d 951 (Ariz. 1944); *Vandiver v. Banks*, 962 S.W.2d 349, 353 (Ark. 1998); *Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 127 (Colo. App. 2007); *Yeazel v. Burger King Corp.*, 526 S.E.2d 112, 119 (Ga. Ct. App. 1999); *Carey v. Fitzpatrick*, 17 N.E.2d 882, 883 (Mass. 1938); *State ex rel. Dickman v. Defenbacher*, 86 N.E.2d 5, 7 (Ohio 1949) (per curiam); *TCI Cablevision of Dallas, Inc. v. Owens*, 8 S.W.3d 837, 844 (Tex. Ct. App. 2000).

*Peaks Fin. Servs., Inc. v. Roth-Steffen*, 778 N.W.2d 380, 387-88 (Minn. Ct. App. 2010) (quotation and citation omitted).[10]

As the district court noted, each of the equitable defenses contains a knowledge component that creates a fact issue that is generally inappropriate for summary judgment. *See, e.g.*, *Valspar Refinish, Inc.*, 764 N.W.2d at 367 ("Waiver generally is a question of fact, and [i]t is rarely to be inferred as a matter of law." (alteration in original quotation and citation omitted)); *Rhee v. Golden Home Bldrs., Inc.*, 617 N.W.2d 618, 622 (Minn. Ct. App. 2000) ("The application of equitable estoppel is a question of fact unless only one inference can be drawn from the facts."); *Valspar Refinish, Inc.*, 764 N.W.2d at 367 ("Waiver generally is a question of fact, and [i]t is rarely to be inferred as a matter of law." (alteration in original quotation and citation omitted)); *Cherne Contracting Corp. v. Wausau Ins. Cos.*, 572 N.W.2d 339, 345 (Minn. Ct. App. 1997) (deciding summary judgment to be inappropriate because a question of fact existed as to the plaintiff's knowledge).

Notwithstanding that general principle, the district court granted summary judgment to Best Buy because it found that "no evidence support[ed] Best Buy's actual or constructive knowledge that the insurance charges in the reconciliation documents for the 1998 to 2003 lease years included costs for the program outlined in the 1998 [M]emorandum." *Best Buy Stores, L.P.*, 636 F. Supp. 2d at 886. The court stated:

---

[10]*See also Holt v. W. Farm Servs., Inc.*, 517 P.2d 1272, 1273–74 (Ariz. 1974); *NW. Ark. Recovery, Inc. v. Davis*, 200 S.W.3d 481, 486 (Ark. 2004); *Polichio v. Oliver Well Works, Inc.*, 362 P.2d 1056 (Colo. 1961); *Lawson v. Dixie Feed & Seed Co.*, 145 S.E.2d 820, 821–22 (Ga. Ct. App. 1965); *Milliken v. Warwick*, 28 N.E.2d 224, 226 (Mass. 1940); *Chase Bank, USA v. Curren*, 946 N.E.2d 810, 816 n.2 (Ohio Ct. App. 2010); *Neil v. Agris*, 693 S.W.2d 604, 605 (Tex. Ct. App. 1985).

> [The 1998] [M]emorandum put Best Buy on notice that the first dollar program existed. The annual reconciliations during this period, however, identified only "large deductibles" and "Self-Insured Deductible costs." The use of the term "deductible" to identify the first dollar program contradicts the 1998 [M]emorandum's explanation that the "self-funded coverage, while similar to a deductible, is not, in fact, a deductible." (Pl. Ex. 112.) Therefore, the equitable defenses raised by the landlord defendants do not prevent Best Buy from bringing its breach of contract claim for the 1998 to 2003 lease years.

*Id.* The district court also found that Best Buy properly objected to the charges, making the equitable defenses inapplicable.

While the district court correctly notes that describing the charges for the First Dollar Program as deductibles conflicts with the 1998 Memorandum's description of the charges, this conflict is not dispositive. Rather, this conflict is one of many considerations the finder of fact must weigh to determine whether Best Buy had constructive or actual knowledge; specifically, whether Best Buy knew that the Landlords were charging it for something other than commercial liability insurance from a third-party insurance provider. Indeed, describing the costs as "Self-Insured Deductible costs" may have at least raised some suspicion that a third-party insurance company was not providing coverage for the common areas.

In addition, other facts may also support Best Buy's knowledge of the Landlords' use of the First Dollar Program. For example, Best Buy expressly permitted three landlords to meet their insurance obligations under the First Dollar Program subject to certain capitalization requirements. This may show that Best Buy knew of DDRC's use of the First Dollar Program. Moreover, in mid-2000, after receiving the first reconciliation documents, Best Buy twice requested underlying documents supporting certain landlords' insurance charges. This fact could lend support to the contention that Best Buy knew it was paying for something that the

-18-

lease did not permit. Also, Best Buy's continued rent payments for several years despite not having received the requested information may show only that they did not wish to breach their lease; however, the payments might also show that Best Buy knew the ramifications of the First Dollar Program and acquiesced to its use. Under these circumstances, we cannot say that there is no issue of disputed fact surrounding Best Buy's knowledge of the First Dollar Program. We find that the district court erred in determining that the Landlords' affirmative defenses regarding Best Buy's breach of contract claims for the 1999–2004 lease years because disputed issues of fact remain regarding Best Buy's knowledge during that time period. Thus, we reverse the district court's grant of summary judgment to Best Buy on its breach of contract claims for the 1999–2004 lease years.

As for the remaining lease years, 2005 to 2009, Best Buy protested those charges by filing this lawsuit. Thus, the equitable defenses alleging that Best Buy acquiesced to the charges for the First Dollar Program would not apply. Further, we agree with the district court's analysis that the voluntary payment doctrine does not apply to the 2005 to 2009 lease years because Best Buy was under economic duress. Thus, we affirm the district court's order granting summary judgment to Best Buy on its breach of contract claims for 2005–2009.

## C. *Damages*

The Landlords also argue that the district court erred by applying the wrong method in calculating Best Buy's damages.[11] The Landlords argue that the proper method of calculating damages should be the difference between what third-party commercial insurance would have cost Best Buy and the amount Best Buy paid for the First Dollar program. Yet, the district court found that Best Buy could recover the

---

[11]We only address the damage award for the 2005–2009 lease years because we remand for the trier of fact to determine Best Buy's breach of contract claim for the 1999–2004 lease years in light of the Landlords' equitable defenses.

amount that it paid for the First Dollar Program. *See Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-2310, 2010 WL 4628548 at 5 (D. Minn. Nov. 4, 2010).

The Landlords' argument misses the point of the suit. Best Buy sued the Landlords because the Landlords charged for something that was not insurance and thus not permitted by the contract—not simply the wrong type of insurance. The dispute is not that Best Buy was charged too much for insurance but that it was charged for something that was not insurance at all. We hold that the district court correctly found that Best Buy could recoup the money that it paid for the First Dollar Program for the 2005–2009 lease years. *Cf. Logan v. Norwest Bank Minn., N.A.*, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999) (holding that the benefit the plaintiff received to be irrelevant to determine expectation damages, "[i]f [the plaintiff] can show that [the lender] breached the contract . . . she would be entitled to be placed in the position she would have been [in] if Norwest had complied with the parties' contract and purchased only coverages authorized by that contract."). Thus, we reject the Landlords' argument that Best Buy should only receive the amount of damages necessary to place it in the position it would have been in had the Landlords complied with the contract.

Because we find that the district court erred in granting summary judgment to Best Buy, we need not address the applicable pre-judgment interest rate until after the resolution of Best Buy's breach of contract claims for the 1999–2004 lease years.

### D. *Best Buy's Dismissed Fraud Claims*

On cross-appeal, Best Buy argues that the district court erred in dismissing its remaining fraud claims with prejudice.

"A district court's decision to allow a plaintiff to dismiss a case voluntarily is reviewed for abuse of discretion." *Crawford v. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (8th Cir. 2001).

Here, Best Buy could have prosecuted its remaining fraud claims at a jury trial; instead it elected to file a Rule 41 motion to get a final judgment. In doing so, it risked the possibility that the district court would dismiss those claims with prejudice. Nonetheless, Best Buy voluntarily moved to dismiss its remaining fraud claims without prejudice. Using its discretion, the district court found that it would be unfair to allow Best Buy to dismiss its remaining fraud claims without prejudice, after years of litigation, on the condition that it could reassert those claims if the results on appeal were unfavorable. We hold that the district court did not abuse its discretion by dismissing Best Buy's remaining fraud claims with prejudice.

## III. *Conclusion*

Accordingly, we affirm the district court's determination that the Landlords breached their contracts with Best Buy and its dismissal with prejudice of Best Buy's remaining fraud claims. We reverse the district court's grant of summary judgment to Best Buy since the Landlords raised equitable defenses that contain genuine issues of material fact. We remand the case for further proceedings consistent with this opinion.

_____